226 F.2d 475
 Manuel Machado MEDINA, Appellant and Cross-Appellee,
v.
Sara ERICKSON, Administratrix of the Estate of Peter Erickson, Deceased, Appellee and Cross-Appellant.
Sara ERICKSON, Administratrix of the Estate of Peter Erickson, Deceased, Appellant,
v.
Manuel Machado MEDINA, Appellee.
 No. 14186.
 No. 14194.
 United States Court of Appeals Ninth Circuit.
 October 19, 1955.
 COPYRIGHT MATERIAL OMITTED No. 14186.
 
 1
 Higgs, Fletcher & Mack, San Diego, Cal., Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for appellant.
 
 
 2
 David A. Fall, San Pedro, Cal., for appellee.
 
 
 3
 No. 14194.
 
 
 4
 David A. Fall, San Pedro, Cal., for appellant.
 
 
 5
 Derby, Cook, Quinby & Tweedt, San Francisco, Cal., Higgs, Fletcher & Mack, San Diego, Cal., for appellee.
 
 
 6
 Before STEPHENS and FEE, Circuit Judges, and WIIG, District Judge.
 
 
 7
 WIIG, District Judge.
 
 
 8
 The questions presented in these appeals and cross-appeals from a decree and orders of the trial court, involving the same parties and arising out of the same factual situation, were consolidated for argument and disposition in this court.
 
 
 9
 Peter Erickson's administratrix was awarded the sum of $6,041.40 as the chief engineer's share of the catch of the fishing vessel D/V Alphecca for two trips on which the decedent did not serve as the chief engineer because of illness. Medina, master and part owner of the vessel, appeals from this award, which was made on the theory that Erickson had been employed for a term of twelve calendar months.
 
 
 10
 Prior to April 12, 1948, Erickson signed shipping articles with Medina to work as chief engineer on the Alphecca, which on that date started her maiden voyage, departing from San Diego, California. The articles provided in part as follows:
 
 
 11
 "It is agreed between the master and seamen of the American oil ship Alphecca, of which Manuel M. Medina is at present master, or whoever shall go for master, now bound from the port of San Diego, California, to Balboa, Canal Zone, and other ports and points on the Pacific Coast and return, for one or more trips and such other ports and places in any part of the world as the master may direct, and back to a final port of discharge in the United States for a term of time not exceeding 12 calendar months."
 
 
 12
 Medina had also executed an agreement with the Cannery Workers' and Fishermen's Union and the Machinists' Union, of which Erickson was a member, which contained this provision:
 
 
 13
 "Article 5
 
 
 14
 "Section 2(a) If any member becomes ill or is injured accidentally on the boat in line of duty, either at sea or in port, a doctor's certificate may be required by the master before permitting said crew member to leave the fishing grounds to return home. Any crew member returning home with the captain's approval shall receive a full share for that particular trip only. The cost of transportation home shall be paid by the boat owners. If thereafter the captain employs a substitute to take such man's place upon return to port, then the amount paid the substitute shall be considered trip expense."
 
 
 15
 During this trip, Erickson became ill and was put ashore at Acapulco, Mexico, on May 21, 1948. He did not rejoin the Alphecca which made two more trips before he died on October 8, 1948. Erickson received his share for the first trip.
 
 
 16
 It is agreed that a chief engineer is a seaman and that a share of a catch is equivalent to wages. The general rule that the payment of wages to a seaman who becomes ill while working continues throughout his term of employment applies here. Jones v. Waterman S. S. Corp., 3 Cir., 1946, 155 F.2d 992.
 
 
 17
 Query: When did Erickson's term of employment end?
 
 
 18
 Shipping articles should, as far as practicable, state "the duration of the intended voyage or engagement, and the port or country at which the voyage is to terminate." 46 U.S.C.A. § 564.
 
 
 19
 In Luksich v. Misetich, 9 Cir., 1944, 140 F.2d 812, 813, a suit for maintenance and wages and for damages, the shipping articles described the contemplated voyage as one from Los Angeles, California, to "`Mexican Waters, Mexico, for one or more trips and return, and such other ports and places in any part of the world as the Master may direct, and back to a final port of discharge in the United States, for a term of time not exceeding six (6) calendar months.'" At page 815, the court said:
 
 
 20
 "The shipping articles do not embody all the basic provisions of the employment (duration of contract and compensation) and consequently must be supplemented by additional terms to constitute a complete agreement. The oral arrangements between the parties herein preceded the written and therefore fall within the familiar principle that oral evidence is admissible to supply omissions in a written contract incomplete on its face. For these reasons we do not agree with the theory that the duration of employment should be restricted to a period consistent with the shipping articles. But a consideration of the evidence leads unerringly to the conclusion that at the time libellant embarked upon the voyage during which he was injured, his agreement with Misetich related to the tuna season only, the result reached by the district court."
 
 
 21
 Although there is authority for the proposition that any ambiguity in interpreting shipping articles should be construed in favor of the seamen, either because they are wards of admiralty who need the court's protection, or because contracts when ambiguous should be resolved against the maker, Gulf Refining Co. v. Home Indemnity Co. of New York, 8 Cir., 1935, 78 F.2d 842; The Thomas Tracy, 2 Cir., 1928, 24 F.2d 372; The Quoque, D.C.E.D.Va. 1919, 261 F. 414; The Catalonia, D.C. E.D.Va.1916, 236 F. 554, it is still true that extrinsic evidence is admissible and may be considered for the purpose of clarifying ambiguous terminology in the articles. Farrell v. United States, 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850; Luksich v. Misetich, supra; Vitco v. Joncich, D.C.S.D.Cal.1955, 130 F.Supp. 945. At the time Erickson signed the shipping articles in question, there was a custom of the industry at the port of San Diego that seamen, including chief engineers, by signing such articles, engaged themselves for only one voyage. There was also evidence from which it could be inferred that Erickson knew of this custom, because he had signed similar articles on two previous occasions within less than a year prior to April 12, 1948. That the remaining members of the crew of the Alphecca and Medina followed this custom is shown by the fact that the seamen and the master signed identical shipping articles for the second and third voyages of the Alphecca. We take note[1] that the agreement between the owners and the union provided that if any member of a crew became ill at sea and returned home with the captain's approval, he would "receive a full share for that particular trip only." Because the articles did not with particularity state the duration of the intended voyage, and in the light of the prevailing custom to sign on for a voyage rather than for a fixed period, we hold that the twelve-month period is a limitation upon the duration of the voyage and not a stated period of employment. Farrell v. United States, supra. Erickson's employment having ended when the Alphecca completed the first voyage, the trial court erred in awarding his administratrix a sum equal to the chief engineer's share of the catch for the second and third trips of the fishing vessel.
 
 
 22
 The trial court held that Erickson's administratrix was not entitled to recover in her causes of action for pain and suffering and for wrongful death. The following findings of fact as to each cause were made by the court:
 
 
 23
 "That the respondent, Manuel Machado Medina, was not negligent; that Peter Erickson was given reasonable medical care and treatment at all times while he was aboard the D/S `Alphecca'; that any delay, if any, in taking Peter Erickson to the nearest port with medical facilities was a reasonable delay; that for some time prior to May, 1948, Peter Erickson had been and at the time of his illness was suffering from incurable bronchogenic carcinoma; that the pain and suffering, if any, and the death of said Peter Erickson resulted from an incurable bronchogenic carcinoma from which he was suffering; that the pain and suffering, if any, and the death of said Peter Erickson was not due to any act or omission on the part of the respondent, Manuel Machado Medina."
 
 
 24
 The record reveals that in May 1947, while employed as chief engineer aboard another fishing vessel, Erickson became ill in the early part of the voyage and was flown back from Guaymas, Mexico, to San Pedro, California, with a lung infection. He was sent to the desert for some time, and resumed his occupation as an engineer serving aboard a fishing vessel on voyages commencing October 17, 1947, and December 29, 1947.
 
 
 25
 On April 12, 1948, Erickson, then 49 years of age, put to sea as chief engineer of the D/V Alphecca, with Medina as master, and twelve other men, for the fishing banks off Central America. All of the men were fishing on shares, and each was liable for his proportionate share of the costs of the voyage. On or about May 8, 1948, Medina's attention was called to the fact that Erickson was not feeling well. Approximately two days later, Erickson was directed to remain in bed and was put under the care of Emmett Fowler, the navigator, who was experienced in the treatment of sick and injured men, and who had treated colds and administered drugs during his service aboard submarines as engineering officer and executive officer in the United States Navy from 1941 to 1945. Erickson's temperature was 102°, and except for the daily morning drop in the thermometer reading, his temperature remained about the same until May 21, 1948. While he was in bed, all of his meals were served to him by the cook, who also at intervals during the day attended to Erickson's needs. The cook prepared special food for him and he was given fruit juices and tomato juice, which were available at all times. He was rubbed with alcohol twice daily, given aspirin, sulfathiazole, penicillin, and liniment rubs. After Erickson had been confined to his bed for two days, Fowler requested Medina to contact the United States Public Health Service in regard to the patient's condition. Medina decided to wait and see, and although this request by Fowler was repeated daily, no message was sent until five days later. A reply containing instructions for treatment of the sick man and a request for more information was received the following day. The instructions were carried out and the requested information relayed. The same day, May 18, 1948, Medina was advised by the Public Health Service to put into the nearest port with medical facilities. The message was received while the crew was fishing, and this activity continued unabated for several hours. Acapulco, Mexico, 447 nautical miles away, was the nearest port with medical facilities. The following day, Medina contacted another fishing vessel in the area which was heading for San Diego, California, about 1600 miles away, for the purpose of putting Erickson on it. The transfer was not effected, however, because the master of the other vessel refused to take Erickson aboard. Medina then headed for Acapulco, and while on this course stopped for approximately an hour to catch about three tons of fish. Just before arriving at Acapulco, Erickson's chest pains diminished. After arrival on the morning of May 21, 1948, he was treated by a doctor, who gave him additional penicillin shots and other medication. He then flew to Mexico City, where he spent the night, and thence to Los Angeles, California, arriving on the evening of May 22, 1948. He remained at home on May 23, was examined by the Public Health Service in San Pedro on May 24, and was sent to the McCornack General Hospital the next day, at which institution he was treated during the following month for unresolved pneumonia. After this treatment, he was released as an out-patient. While in this status, he consulted his own private physician, Dr. Petrich, for a period of a month, until August 25, when he entered the San Pedro Community Hospital, where he remained until his death on October 8, 1948. Dr. Petrich, in preparing the death certificate, certified bronchogenic carcinoma for one year plus as the immediate cause of death, and metastasis of the liver for three months plus as the contributing cause of death.
 
 
 26
 The duty on the part of the master of the vessel upon which Erickson became ill to terminate the fishing voyage and proceed at once to the nearest port where medical facilities were available must be decided with reference to whether Erickson's illness would have appeared to an ordinarily prudent master to be serious, the medical care that was available and was given to Erickson on board the vessel, the care and attention which was actually procured by the master for Erickson, the proximity of the port, the consequences of delay to the interests of the crew, and all other circumstances shown by the evidence which would ordinarily have influenced a reasonably prudent master of a vessel such as the Alphecca in deciding what was reasonably required. De Zon v. American President Lines, 1943, 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065; The Iroquois, 1904, 194 U.S. 240, 24 S. Ct. 640, 48 L.Ed. 955; Holliday v. Pacific Atlantic S. S. Co., 3 Cir., 1952, 197 F.2d 610; Van Camp Sea Food Co. v. Nordyke, 9 Cir., 1944, 140 F.2d 902.
 
 
 27
 We are not faced with the type of illness nor the surrounding circumstances which prompted the court in Holliday v. Pacific Atlantic S. S. Co., supra, to impose liability on the ship owner for failure to take immediate steps to insure medical treatment of an ill seaman. Medina's delay in contacting the United States Public Health Service and charting a course for Acapulco must be viewed in the light of all of the circumstances which confronted him during the period from May 10 to May 19. Erickson was thought to have a severe cold. Treatment for this ailment was available and was administered by Fowler in such a manner as to be denominated by three doctors as anywhere from reasonable to excellent care. He was confined to his bed aboard a comfortable, ocean-going tuna vessel, and was given specially-prepared meals and fruit juices. Although it is true he was running a temperature and complained of chest pains, still there was nothing to indicate that his condition was critical. It would seem that he responded favorably to some extent to the rest and treatment aboard the Alphecca because of his condition upon arrival at Acapulco, and if it had appeared to the doctor who saw and treated him on May 21 that he was critically ill, it is doubtful that the doctor would have permitted him to immediately travel by airplane by way of Mexico City to Los Angeles, California.
 
 
 28
 During the time Erickson was ill, the vessel was engaged in fishing, the weather was good, the sea calm, and conditions for comfortable bed rest were present. Immediately after the attempted transfer to the other fishing vessel, the Alphecca started for Acapulco and pursued that course continuously except for the period of an hour, during which three tons of fish were caught.
 
 
 29
 The foregoing is necessarily a summary of the circumstances as shown by the record on appeal. The entire record does not, in our opinion, reveal a culpable disregard for Erickson's welfare, nor, as we shall consider later, a causal relationship between the delay in putting Erickson ashore and his death on October 8, 1948.
 
 
 30
 In connection with the cause of death, a wealth of evidence was presented to the court by both parties in the form of testimony of numerous doctors of medicine and of medical records. There was some conflicting testimony and thus the court had to pass on the credibility of these witnesses, especially in regard to their respective familiarity with the medical history of the patient and consequent qualification to testify competently on the immediate issue of cause of death. A radiologist, Dr. Haskell, called by the administratrix, testified that as to the cause of death, bronchogenic carcinoma was, in his opinion, the finding most consistent with his knowledge of the case of Erickson. Three doctors called by the decedent before his death to examine him all shared the conclusion he suffered from incurable bronchogenic carcinoma. One of these, Dr. Petrich, attended him to the end and filed the death certificate saying that bronchogenic carcinoma was the cause of death. There were others who gave similar testimony. The administratrix in turn presented doctors who testified that in their opinion unresolved pneumonia was the cause of death. These doctors, however, also admitted that a diagnosis of bronchogenic carcinoma was not inconsistent with the symptoms found by Medina's witnesses and Dr. Haskell. Furthermore, some of these same doctor-witnesses of the administratrix stated that it was not uncommon to find pneumonia secondary to bronchogenic carcinoma.
 
 
 31
 There was some testimony to the effect that the condition of which Erickson died had a prior history antedating the embarkation date of the Alphecca. The great time lapse between the date when Erickson arrived at Acapulco and the date of his death, a period of more than four months, tends to weaken any argument that it was brought about as a result of unresolved pneumonia. Furthermore, X-ray plates did not show the presence of pneumonia until a week after Erickson left the Alphecca.
 
 
 32
 The trial court's findings of fact that there was no causation between the acts or omissions of Medina and the pain and suffering, if any, and the death of Erickson are amply supported by the evidence.
 
 
 33
 Two consultation reports made by doctors who had examined Erickson at the San Pedro Community Hospital were received in evidence over the administratrix' objection. The reports were made in accordance with regulations of the hospital, a recognized member of the American Hospital Association, which required consultation reports to be made on a standard form at or about the time of the examination and filed as a part of the regular hospital records of a patient. Each report was made at the request of Dr. Petrich, Erickson's private physician, and each was based on personal examination of the patient. The findings of both doctors were bronchogenic carcinoma and metastasis of the liver. Denial of the right of cross-examination of the doctors was the basis for the objection.
 
 
 34
 We are of the view that the consultation reports were admissible under 28 U.S.C.A. § 1732.[2]
 
 
 35
 The reports were made in the regular course of business and were required of the consulting physicians in order that they maintain their right to serve on the hospital staff. They were routine records relating to the internal operation and management of the hospital carrying out its prime function of giving medical or surgical care to ill or injured persons. There is no indication whatsoever that the reports were made for the purpose of "litigating." On the contrary, the professional integrity of the entrant was incased in the handwritten record of his examination, observation and diagnosis, made at or near the time of the consultation. These reports bear the seal of trustworthiness, and in our judgment they are not based on speculation or conjecture. Having met the test of § 1732, the reports were admissible even though they contained hearsay and denied to the administratrix cross-examination of the entrants. Buckminster's Estate v. Commissioner, 2 Cir., 1944, 147 F.2d 331; Reed v. Order of United Commercial Travelers, 2 Cir., 1941, 123 F.2d 252; Ulm v. Moore-McCormack Lines, 2 Cir., 1940, 115 F.2d 492; cf. Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645; Pekelis v. Transcontinental & Western Air, 2 Cir., 1951, 187 F.2d 122.
 
 
 36
 In New York Life Ins. Co. v. Taylor, 1944, 79 U.S.App.D.C. 66, 147 F.2d 297, relied upon by the administratrix, a majority of the court affirmed the exclusion of hospital records on the ground that Palmer v. Hoffman, supra, restricted the application of § 1732 to that type of business entries. Stating that the entire hospital records offered were not before it and that some of the entries might be admissible, the court added, at page 306:
 
 
 37
 "The test should be whether they are records of a readily observable condition of the patient or of his treatment. There is no magic in the word diagnosis which makes everything which can be included in that term admissible. Some diagnoses are a matter of observation, others are a matter of judgment, still others a matter of pure conjecture. The admissibility of records of such diagnoses must depend upon their character. Certainly the hearsay accounts and the psychoneurotic conjectures contained in these records cannot be received without cross-examination as proof of a tendency to commit suicide."
 
 
 38
 Judge Edgerton in a strong dissent disagreed with his brethren in their view that Palmer v. Hoffman overruled the Ulm, Reed, and Buckminster cases, and other cases from the Third Circuit which reached similar results. 147 F.2d 306-311. Additional study of the problem leads us to believe that the majority misconstrued the effect of that Supreme Court opinion insofar as it relates to the type of hospital records which were admitted by the trial court.
 
 
 39
 The proctor for the administratrix has cited cases and a text which would appear to be contrary to our ruling on this issue. We have carefully examined each case and the text and hold that we cannot accept the reasoning, or lack thereof, or the statements which the proctor urges in support of his contention that admission of the reports was erroneous.
 
 
 40
 On July 1, 1949, the administratrix filed a libel against Medina for wages, maintenance, care, and damages for pain and suffering of her deceased husband. In her brief it is urged that up to that time she had been misled by the doctor who treated her husband as to the cause of his death (a statement which is not supported by the record on appeal). Upon being advised by a "most competent medical authority that her husband could not have died of bronchogenic carcinoma because there was no evidence of the existence of said condition" (another statement not supported by the record), she filed on January 22, 1951, an action at law for pain and suffering and wrongful death. Medina moved to dismiss the action at law and later the administratrix moved to dismiss her second cause of action in the libel (damages for pain and suffering). The court dismissed the action at law and denied the motion to dismiss the second cause of action in the libel. Subsequently the libel was amended to include a cause of action for wrongful death.
 
 
 41
 The general rule in admiralty is that the libelant is entitled to dismiss as of right unless the litigation has gone so far that substantial rights have accrued to the respondent under the libel already filed. Erie R. Co. v. Boston, C. C. & N. Y. Canal Co., D.C.Mass.1921, 270 F. 876. Prior to filing the motion to dismiss in the admiralty case, Medina had filed his answer, stipulation for costs, a pretrial memorandum, a stipulation concerning the admissibility of certain evidence, taken and filed several depositions, and had expended $280.83, exclusive of the fee to be paid an attorney in Honolulu, Hawaii, for attending the taking of a deposition. An order had issued for the production of hospital records, and the case was ready for trial. Under the circumstances, the court properly denied the motion.
 
 
 42
 That there can be no splitting of the cause of action for pain and suffering and the cause of action for wrongful death is well settled. St. Louis, Iron Mountain & So. Ry. Co. v. Craft, 1915, 237 U.S. 648, 35 S.Ct. 704, 59 L.Ed. 1160; Northern Pacific R. Co. v Maerkl, 9 Cir., 1912, 198 F. 1.
 
 
 43
 The court's order dismissing the action at law was correct and necessary "to avoid the needless litigation in separate actions of what would better be settled once for all in a single action." St. Louis, Iron Mountain & So. Ry. Co. v. Craft, supra [237 U.S. 648, 35 S.Ct. 707].
 
 
 44
 Bills of costs were filed by each party and the court entered judgment against the administratrix for an amount representing one-half of the costs expended by Medina in excess of the costs expended by the administratrix — $257.92. The amount was determined after the court had notified the proctors that it proposed to divide the costs in the foregoing manner. Although a hearing was held on Medina's motion to re-tax costs, followed by the entry of an order re-taxing costs, and two minute orders were subsequently entered on the matter of costs, the record before us is barren of any statement of the opposing proctor which would indicate that his objections on this point were presented to the trial court. Here again, administratrix' proctor urges matters de hors the record in support of his contention that error was committed. No evidence is recorded or cited that the court abused its discretion, nor can any inference be drawn from the record before us that there was an abuse of discretion, in the taxation of costs. With some reluctance, but bearing in mind the nature of the case, we refrain from affirming on the matter of costs and will remand this issue to the trial court, where the record is undoubtedly complete, for the purpose of deciding whether there is merit in this contention.
 
 
 45
 Finally, it is contended the court erred in not allowing interest on maintenance, cure and wages from the date they became due. Medina expressly waived his right of appeal from the decree with respect to the award for maintenance and cure, and in view of our reversal of the award for wages, we need only decide whether interest should have been allowed on maintenance and cure from the time they became due.
 
 
 46
 "The right to recover wages, maintenance and cure arises ex contractu. The obligation of the owner-operator is `a material ingredient in the compensation for the labor and services of the seamen'. Harden v. Gordon, 11 Fed.Cas. pages 480, 481, No. 6,047, 2 Mason 541." Warren v. United States, D.C.Mass.1948, 75 F.Supp. 836, 838.
 
 
 47
 In the absence of a finding of "peculiar facts" causing the denial of interest from the date the maintenance and cure became due, we are of the opinion that interest should have been allowed from that date, or dates, rather than from the date of filing the amended libel on October 2, 1951. The President Madison, 9 Cir., 1937, 91 F.2d 835.
 
 
 48
 The decree is reversed as to the award to the administratrix of the sum of $6,041.40, plus interest, in the second cause of action. On the third and fourth causes of action, the decree is affirmed. It is ordered that the decree be amended to allow interest on the award for maintenance and cure from the date, or dates, they became due, and the matter of taxation of costs is remanded for further proceedings consistent with this opinion.
 
 
 49
 The orders of the trial court dismissing the action at law filed January 22, 1951, and denying the motion to dismiss administratrix' second cause of action in the original libel are affirmed.
 
 
 
 Notes:
 
 
 [1]
 But we place no reliance on the provisions of the collective bargaining agreement in reaching our conclusion
 
 
 [2]
 Section 1732 reads:
 "In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.
 "All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.
 "The term `business,' as used in this section, includes business, profession, occupation, and calling of every kind."
 This section is based on former 28 U.S. C.A. § 695. And see Rule 43, Federal Rules of Civil Procedure, 28 U.S.C.A.