**David C. STERLING, Plaintiff,**

v.

**NEW ENGLAND FISH COMPANY, Defendant.**

**No. C75–271S.**

United States District Court, W. D. Washington.

Feb. 24, 1976.

Pinckney M. Rohrback, C. Kenneth Grosse of Keller, Rohrback, Waldo & Hiscock, Seattle, Wash., for plaintiff.

Robert V. Holland of Bogle & Gates, Seattle, Wash., for defendant.

## MEMORANDUM OF DECISION

BEEKS, District Judge.

Plaintiff seeks damages as the result of a fall on the ramp of a floating dock owned by defendant at Ketchikan, Alaska. The mishap occurred July 22, 1974 while plaintiff was a member of the crew of defendant's purse seine fishing vessel ST. JOHN, which was berthed at the floating dock. At 9:30 a.m. plaintiff left the vessel to purchase provisions, one of his duties as ship's cook. Returning approximately one hour later, he slipped on the ramp while descending to the floating dock and fell to the dock, sustaining severe injuries to his right knee.

Plaintiff contends that the footing on the ramp was treacherous and that defendant was thus negligent in failing to furnish him with a safe place to work, such negligence being the proximate cause of his damage. Defendant denies negligence and asserts that Sterling was contributorily negligent.

The floating dock is situated at the end of and below defendant's cold storage plant which is located on a pier. Access to the dock is by means of a ramp affixed to the cold storage pier by hinges and which rests on the floating dock on a set of rollers. The lower end of the ramp thus moves up and down with the rise and fall of the tide. The ramp is of wooden construction, approximately four feet wide and 55 feet long. The left side while descending is cleated with wooden strips approximately 14 inches apart placed crosswise. They are triangular in shape and fashioned from four-by-four lumber cut diagonally. The other side of the ramp is smooth to permit carts to be pulled up and down without hindrance. The ramp has a wooden railing on each side, approximately 35 to 40 inches high.

▮▮▮ On the morning of July 22 it was raining. The tide was low (the diur-

nal range being approximately 15 feet) and the angle of the ramp was steep.[1] Furthermore, the cleats were rounded from many years of use, the grain of the principal blanks ran parallel to the walking surface, and the walking surface of the ramp was without any abrasive or other nonskid material. Defendant had an obligation to supply plaintiff with a safe means of access to the vessel,[2] but such a steep, slippery and hazardous means of ingress did not meet that requirement.

Was plaintiff contributorily negligent? The fall occurred near the bottom cleat, when plaintiff's left foot skidded out from under him and he fell to the floating dock with his right leg buckled beneath him. Plaintiff testified he used great care in descending the ramp. Using a cane necessitated by an earlier injury, he proceeded slowly. With the cane in his right hand and his left hand on the railing, plaintiff reached forward, placed the cane against a cleat, then stepped onto the cleat first with his left foot and then with his right. In this manner he moved from cleat to cleat successfully until he slipped while attempting to step onto the last one.

Did the preexisting injury to plaintiff affect the duties of the parties and hence their respective liabilities? Plaintiff had been injured in a motorcycle accident in 1965 and in a slip and fall at sea in 1969. Both injuries were to his right leg and hip and were further complicated by the development of osteomyelitis. He underwent major surgery several times and eventually had his right hip removed. The result of all this was that plaintiff's right leg was shortened and he walked with a limp. The evidence also shows that plaintiff was not seriously incapacitated by his disability. He was able to remain very active and was an enthusiastic outdoorsman. He was able to take long hikes, although he used a cane. When he sought em-

---

1. Kjell R. Ulland, defendant's manager of seine boat operations at Ketchikan, made a report on the day of the accident, stating simply: "The tide was real low so the ramp was really steep and at the same time slippery from the rain." Plaintiff's Exhibit 12.

2. *Reyes v. Marine Enterprises, Inc.*, 494 F.2d 866, 869 (1st Cir. 1974).

ployment as a crew member on the ST. JOHN he informed the master, Del Krajewski, of his disability. Nevertheless, after demonstrating what he could do, plaintiff satisfied Krajewski of his ability to work and was hired. There is no indication that plaintiff's condition in any way hindered his work in preparing the vessel for its voyage or in his work at sea. The fact remained, however, that he was a man with a physical disability.

■ The standard of conduct demanded of plaintiff in these circumstances is that of a reasonable man. The fact of his preexisting injury does not change this standard. The principle is succinctly stated in Restatement (Second) of Torts, Section 283C:

> If the actor is ill or otherwise physically disabled, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like disability.

Although a disabled man is required to behave with reasonable prudence for a man in his condition, the actual behavior expected is likely to be different from that demanded of a person without the disability.[3]

■ Plaintiff used considerable care in negotiating the hazardous gangway. Knowing his disability could he have done more? During trial at the request of the Court plaintiff demonstrated the technique he used in descending the ramp. At the Court's request he walked along the jury box using the jury box railing as he did the ramp railing. In so doing he merely placed his left hand on top of the railing for balance rather than gripping it with his fingers. Had he gripped the railing it would be my conclusion that he had exercised all the caution reasonably to be expected under the circumstances. This was not done, however, and I believe that a firm grip might well have prevented the fall when his left leg skidded. Thus I find that plaintiff was contributorily negligent to the extent of 20 percent of his injury.

■ A defendant, too, may have a greater duty of care imposed upon it, a duty arising by the employment of a man with a known disability.[4] In this case, however, I am satisfied that plaintiff's mobility and agility were substantially the same as that of the other crew members, and no special precautions for plaintiff's sake were required. My finding of negligence on defendant's part is based upon the conclusion that the access ramp was hazardous to everyone.

By agreement both sides have submitted as evidence medical reports by competent physicians. The reports indicate little difference of opinion as to the nature of plaintiff's injuries resulting from the Ketchikan fall. Each analysis indicates that plaintiff complains of constant pain in his right knee. The only significant disagreement in the reports is as to the quantum of permanent partial disability attributable to the accident. The report of Dr. John Callahan, submitted by defendant, estimates the dis-

---

3. "The rule that the conduct of the ordinarily prudent person under given conditions established by law is the standard to be applied in determining whether the plaintiff has been guilty of contributory negligence applies to the physically disabled as well as to the physically fit. Reasonable care in the case of a plaintiff who has defective vision is such care as an ordinarily prudent person with a like infirmity would exercise under the same or similar circumstances. However, the fact that a person is afflicted with a physical disability requires him to put forth a greater effort for his own safety than one not disabled, in order to attain the standard of the ordinarily prudent man which the law has established for everybody."

38 Am.Jur. 895, Negligence § 210, quoted in *Darter v. Greenville Community Hotel Corp.*, 301 F.2d 70, 78 (4th Cir. 1962).

4. "Persons who are known to be disabled physically are entitled to greater care than those who are well and strong and in possession of all their faculties. Or, to put it in another way and as a matter of principle, hereinbefore discussed, although only ordinary care is owed to a disabled person, the disability when known is a circumstance which must be considered in determining whether the proper degree of care for his safety has been exercised." 57 Am.Jur.2d 434, Negligence § 86.

ability at 10 percent as compared with amputation of the right leg at the knee joint. Dr. John Dunn, retained by plaintiff, rates the permanent partial disability at 45 percent.

■ I am unable to discern any medical reason for the difference between the two estimates of disability, and I respect the opinions of both men. Accordingly, I adopt the median approach and conclude that the degree of disability is 27½ percent for which I award damages in the amount of $25,-000. The pain and suffering experienced by plaintiff is also of sufficient magnitude to merit compensation, and for this I award the amount of $10,000.

■ Plaintiff is entitled to be compensated for lost earnings, both past and future. The amount awarded should reflect the time necessary for recovery from the injury and a period of rehabilitation. I have concluded that the total period shall be three years. During trial plaintiff proved to be unusually intelligent, articulate and ambitious. He testified that he plans to complete his current community college education to graduation. I have no doubt but that his educational endeavors will yield a future brighter than that which he would have had in a career at sea.

■ Plaintiff's highest annual income previous to the present injury was $8,000 in the years 1968–69. It is reasonable to conclude that had the injury not occurred plaintiff would be earning at approximately the same rate. I award him $24,000 for lost earnings, past and future. Presumably, plaintiff has received lost earnings from the date of injury to the end of the period for which he was employed by defendant. The record is silent on the subject and the present action does not contain a count therefor, but the law is well settled that a fisherman on shares, lays or wages is a

seaman and, if injured in the service of his vessel, entitled to lost earnings for the period of employment and also to maintenance and cure.[5]

■ The total medical expense incurred by plaintiff as a result of the current injury is $5,163.40. The question is raised whether plaintiff had legitimate reasons for refusing the free services of the United States Public Health Service and seeking care at a private facility. For treatment as important as that required by plaintiff, confidence in one's physician is vital. I am persuaded that his lack of confidence in the orthopedist attending him at the Public Health Service Hospital was justified and that he was entitled to seek cure elsewhere. Thus, I award him the amount of $5,163.40. In addition, and for the same reasons, I award plaintiff the following miscellaneous expenses incurred in conjunction with his medical care: $200 for medicines and $100 for transportation to and from the health facilities.

■ Plaintiff has requested $1,500 for future medical expenses such as corrective knee surgery or therapy. The medical reports indicate that further treatment may indeed be required, but I find such statements to be too speculative to justify an award at this time. However, if later proved necessary plaintiff is not without a remedy.[6]

The total award for damages is computed as follows: $25,000 for disability; $10,000 for pain and suffering; $24,000 for lost earnings; and $5,463.40 for hospital and medical expense, for a total of $64,463.40. Discounted by 20 percent to account for plaintiff's contributory negligence the net award is $51,570.72.

The foregoing shall constitute my findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

5. The Law of Seaman (Third Edition) by Norris, Sec. 581; Medina v. Erickson, 226 F.2d 475 (9th Cir. 1955); The Betsy Ross, 145 F.2d 688 (9th Cir. 1944); Mason v. Evanisevich, 131 F.2d 858 (9th Cir. 1942).

6. Calmar Steamship Corp. v. Taylor, 303 U.S. 525, 528–30, 58 S.Ct. 651, 82 L.Ed.2d 993 (1938).