JEAN MARTINEAU AND ANOTHER v.
CARLETON A. NELSON AND ANOTHER.

247 N. W. 2d 409.

November 12, 1976—No. 46461.

---

*Rischmiller & Wasche* and *Robert Wm. Rischmiller,* for appellants.

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson II,* and *Mary Jeanne Coyne,* for respondents.

Considered and decided by the court en banc.

KELLY, JUSTICE.

Plaintiffs appeal from an order of the district court denying their motion for judgment notwithstanding the special verdict and a new trial against defendant Dr. Carleton A. Nelson on the issue of damages or for a new trial against both defendants. We reverse with instructions to grant a new trial against both defendants on the issues of their negligence and the contributory negligence of plaintiff wife, and on the issue of damages.

This is an action by plaintiffs, husband and wife, against two

physicians for alleged malpractice and breach of warranty in connection with the performance of a tubal ligation sterilization procedure on the wife. During her fourth pregnancy, plaintiff wife reported suffering from extreme tension and nervousness. After discussion of this problem with defendant Dr. Robert L. Sturges (hereinafter the family doctor), she decided to undergo a tubal ligation at the time of her fourth delivery. The record discloses that the doctor prescribed certain medication for plaintiff's tension and that he certified that it would be "medically unwise" for plaintiff to have future pregnancies. The record of medical testimony discloses that the purpose of a tubal ligation is to take a wedge or cross section out of each tube and to tie off or ligate the openings of the tubes so that the egg and sperm cannot pass through the tubes and unite to produce conception.

The tubal ligation was performed by defendant Dr. Carleton Nelson, a general surgeon (hereinafter the surgeon), at the time of the fourth delivery. Both plaintiffs signed a consent form acknowledging that no guarantees had been made as to the result of the operational procedures. Plaintiff wife signed the form while still under anesthetic following the birth of the child. Following that surgery, the pathology report showed that one section removed was a cross section of the left Fallopian tube, but that the second section of tissue, instead of being a cross section of the right Fallopian tube, was a cross section of artery. This erroneous removal occurred despite the fact that the Fallopian tubes are 3 to 7 mm in size and can be identified visually during the operation.

The family doctor testified that he and the surgeon concluded from the pathology report that no wedge or cross section of the right Fallopian tube had been removed. Although he testified that he did not conclude that the ligation had been unsuccessful, his records show a notation of unsuccessful ligation. The two doctors decided to do a hysterosalpingogram (X-ray study of the tubes) to determine whether the right tube had nonetheless been effectively blocked by the suturing done by the surgeon. That

study was done, and both doctors concluded from the X-rays that both Fallopian tubes were blocked.

The doctors discussed this situation with plaintiff wife. There is much ambiguity and conflicting testimony in the record concerning what was said at the conference between plaintiff wife and the two doctors. Since what was said at that conference is critical to a resolution of the issues in this case, we will endeavor to summarize all of the testimony, although we must consider that testimony in the light most favorable to the verdict.

The family doctor testified that he told plaintiff wife that he felt, based on the X-ray study, that both tubes were blocked. He did not, according to his testimony, either recommend or affirmatively advise against a second operation. He did, however, comment on the disadvantages of one—expense, rehospitalization, greater risk, etc.—and stated that he preferred not to do this if he did not have to. He offered her instead a free vasectomy for her husband and encouraged that as an alternative. He testified regarding the conference:

"Q. Now, I want you to relate for me as best you can, the discussions that you had with Mrs. Martineau on the 14th day of December, 1971, after you performed these x-rays and in the presence of Dr. Nelson as to what the alternatives were?

"A. Well, I told her I thought the tubes were ligated on the basis of the x-ray findings, but that we couldn't be certain because we didn't have that segment, and I did not tell her that I thought she was—that it was okay. I didn't tell her that I thought she was infertile. We did again discuss the possibility of vasectomy. I thought vasectomy was the route to go because it could be done in my office. It could be done without any risk to either party and without any expense. I can't spare them hospital expense if—

"Q. Well, just what you said.

"A. Well, I think I talked about that, too.

"Q. All right. What did you say?

"A. We did discuss the fact that I wasn't—I was hoping she

would not have to go back, and I regretted the idea of her having to go back and repeating the tubal ligation and asked her what she wanted to do. I did ask her what she wanted to do, and I remember her saying that she wanted to think about it and talk about it, and she thought she was going to just decide to go with the way things are, sort of what will be, will be.

"Q. Anything else?

"A. I think that is mainly it."

The surgeon, on the other hand, saw no need for a second operation or a vasectomy, and apparently so advised plaintiff wife at the conference. His testimony regarding the conference was, in part, as follows:

"Q. Now, Doctor, in discussing—was it just Mrs. Martineau that was present with you and Dr. Sturges when you were discussing this hysterosalpingogram with her?

"A. Yes.

"Q. Okay. And I believe you did show her the films?

"A. Yes. They were there.

"Q. And you did tell her at that time, did you not, that the hysterosalpingogram showed that the tube was in fact blocked?

"A. Yes. She was told that.

"Q. Okay. And from that you had concluded that the surgery had been successful and she could no longer have any pregnancies?

"A. Concluded from that that the tube had been ligated, although the pathology did not show that a section of a tube was removed.

"Q. But it did indicate at that time that on the basis of the x-ray findings, that this tube was in fact blocked?

"A. It was blocked at that time.

"Q. And did you further advise her that because of the findings on this, that it would be necessary for her to be reoperated on?

"A. I don't recall the exact words in the conversation, but

there was no evidence on pathology that suggested that she have a reoperation or vasectomy to Mr. Martineau.

"Q. But you did indicate to her, did you not, that because of your findings on this x-ray, that such reoperation would not be necessary?

MR. MARKHAM [Defendants' counsel]: Well, objection to that, Your Honor, this is repetitious of the same question, and he keeps referring to what he said, and as I understand it, the conversation with Dr. Sturges—

THE COURT: Perhaps you could clarify that, Mr. Rischmiller.

By Mr. Rischmiller [Plaintiffs' counsel]:

"Q. Well, you did talk with Mrs. Martineau, did you not?

"A. Yes.

"Q. And Dr. Sturges talked with her, also?

"A. Yes. We explained the situation.

"Q. And it was explained to her by either you or Dr. Sturges that the reason for doing this hysterosalpingogram was to determine whether or not the tube was in fact blocked?

"A. That's right.

"Q. And from the x-ray findings, you found that it was blocked?

"A. Yes.

"Q. And you also felt that because of this conclusion, that it would not be necessary for her to be reoperated on?

"A. Be unlikely that it would have to be, but if she had any qualms or uneasy feeling about it, then we offered it as a—

"Q. Okay. So the reason for suggesting these other possibilities would be because of any qualms or uneasy feeling that she would have?

"A. That she would have or that we would have.

"Q. Well, did you feel that she should be reoperated on at that time?

"A. We felt that was one alternative preferable for—

"Q. Did you recommend it to her?

"A. No. That was recommended by—or suggested to her, I should say, by Dr. Sturges.

"Q. Did either of you recommend that she be reoperated on?

"A. We did not push for reoperation at this time, no.

"Q. I am sorry?

"A. Or recommendation.

"Q. I am not talking about—

"A. Or recommendation.

"Q. Did you—

"A. That was an alternative recommendation. It was an alternative that was to be done.

"Q. Doctor, I am just asking this: did you recommend that she go back in the hospital and be reoperated on?

"A. Oh, no.

MR. MARKHAM: That is objected to on the ground he has answered it. He said—

THE COURT: No, no. Overruled. He may answer.

THE WITNESS: We did not. At that time we did not say we will go back in the hospital and have reoperation, no.

By Mr. Rischmiller:

"Q. All right. Did you later on, at any time later on, tell her that she should go back in the hospital and be reoperated on?

"A. I did not, no.

"Q. And the only reason that you gave for that is the alternative—or the vasectomy would be if they felt uneasy about it?

"A. If there was any doubt in their minds, yes."

Plaintiff wife had a somewhat different recollection of the conference from that of her doctors. She testified that it was her understanding from her consultation with the doctors that she could not become pregnant. She also contended that the free vasectomy was offered if she and her husband felt uneasy in their marital relations. Her testimony contained the following:

"Q. Okay. And then they did show you the x-ray films as a result of that?

"A. Yes, they did.

"Q. And did they explain them to you?

"A. Yes, they did.

"Q. And what did they tell you?

"A. They told me that they felt that the tube ligation had been successful and that I would not be able to get pregnant.

"Q. Was anything further stated as far as reoperation or vasectomy as far as your husband was concerned at that time?

"A. Yes, there was. They said that being that they felt the tubes were tied off, that there would be no reason to go back in for the operation to have it redone, which they felt was done right to begin with, but that they felt uneasy—if we felt uneasy in our marital relations, that they would perform a vasectomy on my husband, and you know, after I went home, if we felt that we just couldn't relax, that they would do this."

Plaintiff wife also testified that she understood that if the ligation were performed properly, pregnancy could not result. Based on her impressions of the conference, she and her husband discussed the problem and decided not to have any further surgery done.

Approximately 9 months after the sterilization procedure, plaintiff wife was found to be pregnant. She delivered her fifth child, David, a normal and healthy child, after a normal pregnancy. Abortion was discussed as an alternative but rejected. Plaintiffs brought this action against defendants alleging breach of warranty and negligence and asking various kinds of damages for the birth of an unwanted child.

At the close of plaintiffs' case, the trial court directed a verdict for the family doctor on the issue of negligence and submitted only his alleged warranty of no pregnancy to the jury. The jury found that no such warranty was given.[1] The case was also sub-

[1] The jury was entitled to believe the family doctor's testimony as opposed to plaintiff wife's, and this finding is therefore supported by the evidence.

mitted on the negligence of the surgeon and the contributory negligence of the plaintiffs.[2] The special interrogatories relating to plaintiffs' claim against the surgeon, and the findings of the jury in response to those dealing with negligence, are as follows:

"1. Was the defendant, Dr. Carleton Nelson, negligent in performing the operation on Jean Martineau?

"Answer 'Yes' or 'No'.   Yes.

"2. If your answer to Question No. 1 is 'Yes', then answer this question. Was the negligence of Dr. Nelson in performing said surgery a direct cause of the pregnancy of David Martineau?

"Answer 'Yes' or 'No'.   Yes.

"3. Was Jean Martineau negligent in having said child?

"Answer 'Yes' or 'No'.   Yes.

"4. Was said negligence a direct cause of the birth of said David Martineau?

"Answer 'Yes' or 'No'.   Yes.

"5. If your answers to all four questions are 'Yes', taking all of the negligence at 100 percent, what percentage do you attribute to:

"a. Dr. Carleton Nelson                              50 percent
"b. Larry and Jean Martineau                    50 percent
        Total                                              100 percent

"6. What damages, if any, did plaintiff, Jean Martineau sustain as a result of the birth of said child in the past up to the date of trial?

$ . . . . . . . . . .

"7. What damages will she sustain in the future as a result of the birth of said child?

$ . . . . . . . . . .

"8. What amount of damages did plaintiff, Larry Martineau sustain up to the time of trial for loss of consortium?

$ . . . . . . . . . .

---

[2] Plaintiffs did not assign as error the failure to submit the issue of whether Dr. Nelson had given any warranty.

"9.  What damages, if any, will plaintiff, Larry Martineau sustain in the future as and for the cost of raising David Martineau?

$ . . . . . . . . . .

"10.  What is the value of the affection, love, care and services of David to Jean Martineau $ . . . . . . . . . . . . . ., to Larry Martineau? $ . . . . . . . . . ."

The verdict was concurred in by five of the six jurors. In accordance with the Minnesota comparative negligence statute,[3] the trial court ordered judgment for defendant Dr. Nelson, and, on the basis of the finding that defendant Dr. Sturges had made no warranty, also ordered judgment for him.

A single issue is dispositive of the appeal: Was the jury's finding of 50-percent contributory negligence supported by the evidence?

Plaintiffs argue that the issue of contributory negligence was improperly submitted to the jury and that its finding on that issue is not supported by the evidence. This is a case of first impression on the issue of contributory negligence in a sterilization case. While there have been several reported decisions dealing with actions for malpractice in performing sterilization operations,[4] including an early Minnesota case sustaining a demurrer to a complaint on a deceit theory,[5] the bulk of the sterilization cases deal with the burden of proof under theories of negligence and breach of warranty and the problem of provable damages.

Contributory negligence has been recognized as a defense in a number of malpractice cases in other jurisdictions.[6] The de-

_____

[3] Minn. St. 604.01, subd. 1. The jury was instructed on the effect of a 50-50 allocation of negligence on plaintiffs' recovery in accordance with Rule 49.01(2), Rules of Civil Procedure.

[4] See, Annotation, 27 A. L. R. 3d 906.

[5] Christensen v. Thornby, 192 Minn. 123, 255 N. W. 620 (1934).

[6] See generally cases collected and discussed in 1 Louisell & Williams, Medical Malpractice, § 9.03; Harney, Medical Malpractice, § 7.1; Note, 8 U. of San Francisco L. Rev. 386; Note, 21 Cleveland State L. Rev. 58.

fense has been recognized in cases in which the patient has (1) failed to follow the doctor's or nurse's instructions;[7] or (2) refused suggested treatment;[8] or (3) given the doctor false, incomplete, or misleading information concerning symptoms.[9] This court expressly recognized the defense in 1970 in upholding a general verdict for defendant doctor following the submission of his negligence and plaintiff's contributory negligence. In that case, plaintiff had submitted misleading and inaccurate information about her employment status to the doctor and had no telephone, making it difficult for him to contact her regarding the positive result of her Pap smear test. Ray v. Wagner, 286 Minn. 354, 176 N. W. 2d 101 (1970).

Both courts and text writers have emphasized, however, that the availability of a contributory negligence defense in a malpractice case is limited because of the disparity in medical knowledge between the patient and his doctor and because of the patient's right to rely on the doctor's knowledge and skill in the course of medical treatment.[10] Thus, it has been held that it is not contributory negligence to follow the doctor's instructions[11] or to fail to consult another physician when the patient has no reason to believe his pain is caused by the doctor's negligence.[12] It has also been suggested that the patient's neglect of his own health after negligent treatment may be a factor in reducing damages, but should not bar all recovery.[13] Louisell and Wil-

[7] See, e. g., Welker v. Scripps Clinic & Research Foundation, 196 Cal. App. 2d 338, 16 Cal. Rptr. 538 (1961).

[8] See, e. g., Hunter v. United States, 236 F. Supp. 411 (M. D. Tenn. 1964); Dodds v. Stellar, 77 Cal. App. 2d 411, 175 P. 2d 607 (1946).

[9] See, e. g., Rochester v. Katalan, 320 A. 2d 704 (Del. 1974).

[10] See, 1 Louisell & Williams, Medical Malpractice, § 9.03; Harney, Medical Malpractice, § 7.1.

[11] See, Largess v. Tatem, 130 Vt. 271, 291 A. 2d 398 (1972).

[12] See, Johnson v. United States, 271 F. Supp. 205 (W. D. Ark. 1967); Rahn v. United States, 222 F. Supp. 775 (S. D. Ga. 1963).

[13] See, e. g., Sanderson v. Moline, 7 Wash. App. 439, 499 P. 2d 1281 (1972).

liams have added the following relevant caveats regarding use of the defense:

"* * * But negligence of the patient which occurs after treatment, although not qualifying as contributory negligence which bars all recovery, may reduce it on the principle that plaintiff cannot recover for his own aggravation of the damages.

\* \* \* \* \*

"(4) Ordinarily it is not contributorily negligent for the patient to refuse to submit to a second procedure which is intended to correct the result of the physican's negligent initial treatment." [14] Louisell & Williams, Medical Malpractice, § 9.03, p. 248.

The relevant issue in this case, which must be considered in light of the record and the authorities just discussed, is whether and to what extent plaintiffs may be charged with acting unreasonably in the face of certain statements and advice of defendant doctors. Confronted with the results of a pathological test showing the removal of a segment of an artery and with equivocation on the part of her doctors as to the success of the operation and the necessity of further procedures, plaintiff wife might have acted unreasonably in failing to at least attempt to persuade her husband to have a vasectomy or, in the absence of vasectomy, in failing to continue a regimen of birth control.[15] The record,

---

[14] As authority for this statement, the authors cite two Ohio cases: Thackery v. Helfrich, 123 Ohio St. 334, 175 N. E. 449 (1931) (plaintiff not required to have open reduction of fracture after faulty union resulted from doctor's negligence); Bird v. Pritchard, 33 Ohio App. 2d 31, 291 N. E. 2d 769 (1973). The latter case is distinguishable on the ground that at the time of plaintiff's alleged negligence, it would have been impossible to repair the damage caused by the doctors' initial negligence.

[15] Contrary to the suggestions of counsel at the trial, we think these are the only aspects of contributory negligence revealed on this record. Plaintiff wife was not negligent in failing to have a second operation because neither of her doctors were affirmatively recommending that procedure. Moreover, plaintiffs were likewise not negligent in failing to have an abortion or give up their child for adoption. The policy of

however, provides only the barest minimum support for these inferences of negligence. The record does not clearly reveal what plaintiff wife did or did not tell her husband about her conference with the doctors. Furthermore, there is no clear evidence of what birth control methods plaintiff did or did not use after the conference and up to the time the child David was conceived.

The evidence of plaintiff husband's contributory fault is plainly insufficient. The only evidence as to his conduct is that he concluded that his wife could not become pregnant and he elected not to have a vasectomy. There is no evidence that he received any advice directly from the doctors nor any evidence that he acted unreasonably in arriving at his conclusion. Moreover, we think that the law of contributory fault should not compel a 32-year-old husband, who might possibly remarry and later change his mind regarding more children, to undergo sterilization because of a surgeon's negligence.

From our evaluation of the evidence, we have concluded that there must be a new trial for two reasons. First, since we have concluded that plaintiff husband could not have been guilty of any negligence, and since the jury was asked to apportion negligence to husband and wife together, we cannot be certain to what extent the jury relied on erroneous theories as to the husband's negligence in making its apportionment.[16] Second, while there

---

the law would be thwarted if plaintiffs were forced to make such moral and ethical choices regarding themselves and their child under a cloud of contributory fault. These aspects of plaintiff's conduct do not go to fault but to the measure of damages, which is neither raised on this appeal nor decided in this opinion.

[16] The form of the special verdict in this case is fatally defective. Although the apportionment question is directed to the negligence of "Larry and Jean Martineau," there is no previous question directed to Larry Martineau's negligence. Thus, the jury is asked to apportion the negligence of a party it has not found negligent. While counsel for the defendant is correct in his statement that such an error is waived if not objected to in the trial court, see Thielbar v. Juenke, 291 Minn. 129, 189 N. W. 2d 493 (1971); Raymond v. Baehr, 289 Minn. 24, 184 N. W. 2d 14 (1970), counsel in this case did object generally to the submission of the

may be some evidence of negligence on the part of plaintiff wife and while the apportionment of such negligence is normally within the province of the jury,[17] we think the 50-50 apportionment in this case is plainly contrary to the weight of the evidence.

We are confronted in this case with the initial failure of the surgeon to properly perform a tubal ligation, coupled with the equivocal statements of the doctors to plaintiff wife regarding the result (i. e., both doctors say her tubes are blocked, one encourages vasectomy, the other encourages further procedures if plaintiffs would feel uneasy about marital relations), and plaintiffs' reaction in electing not to pursue further procedures. Neither doctor apparently discussed with plaintiff wife the risks of pregnancy notwithstanding the operation or directly informed her that she could become pregnant again. Under these circumstances, plaintiffs cannot be held equally negligent with the surgeon because the subject matter of their negligence is the interpretation of medical matters about which the doctors owed a greater duty to them than plaintiffs owed to themselves. The superior knowledge and skill of the physicians in this case should have been reflected in straightforward, complete, and accurate information and advice to their patient. That patient should not be denied recovery because she could not sift from their equivocation this kind of information and advice.

For the reasons stated above, we have concluded that there

contributory negligence of both plaintiffs. Since we have found the evidence insufficient to support the jury's finding of 50-percent negligence on the part of Larry and Jean Martineau, the special verdict form may be corrected at the new trial.

[17] See, Campion v. Knutson, 307 Minn. 263, 269, 239 N. W. 2d 248, 251 (1976); Riley v. Lake, 295 Minn. 43, 58, 203 N. W. 2d 331, 340 (1972); Martin v. Bussert, 292 Minn. 29, 193 N. W. 2d 134 (1971). But this court has not hesitated to upset the apportionment or grant a new trial in the interest of justice where the evidence indicates a disparity in duty, knowledge, or ability to act among the parties. Ferguson v. Northern States Power Co. 307 Minn. 26, 34, 239 N. W. 2d 190, 195 (1976); Robertson v. Johnson, 291 Minn. 154, 190 N. W. 2d 486 (1971).

106

must be a new trial against both defendants on the issues of their negligence, of the contributory negligence of plaintiff wife, and of damages.[18]

Reversed and remanded with instructions to grant a new trial.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.

---

[18] In granting a new trial, we intimate no view on the difficult question of the measure of damages in a negligent sterilization case. See, Annotation, 27 A. L. R. 3d 906, 917; Terrell v. Garcia, 496 S. W. 2d 124 (Tex. Civ. App. 1973), certiorari denied, 415 U. S. 927, 94 S. Ct. 1434, 39 L. ed. 2d 484 (1974); Coleman v. Garrison, 349 A. 2d 8 (Del. 1975); Custodio v. Bauer, 251 Cal. App. 2d 303, 59 Cal. Rptr. 463, 27 A. L. R. 3d 884 (1967). We do, however, approve the trial court's use of a special verdict in this case which carefully preserves the relevant separate items of alleged damage and benefit for possible further litigation.