Ernestine J. ROTAN, et al., Appellants,

v.

Diane J. EGAN, et al., Appellees.

Nos. 81–1036, 84–1507.

District of Columbia Court of Appeals.

Argued Nov. 5, 1986.

Decided Feb. 11, 1988.

Barry J. Nace, with whom Lynn Suzanne Spradley was on the brief, for appellants. Richard S. Paulson also entered an appearance for appellants.

Steven A. Hamilton, with whom Benjamin S. Vaughn was on the brief, for appellees. William A. Ehrmantraut and William F. Causey also entered an appearance for appellees.

Before MACK, BELSON,[*] and ROGERS, Associate Judges.

MACK, Associate Judge:

This is an appeal from a jury verdict in favor of appellee physicians against Ernestine J. Rotan and her husband, Bernie Ro-

tan, in a medical malpractice suit. The suit alleged that Mrs. Rotan developed a bacterial growth on her heart valve which ultimately required replacement of the valve as a result of appellees' negligent care, diagnosis, and treatment. Appellants claim that several of the trial court's evidentiary rulings are in error.[1] None of the issues raised warrant reversal.

## I

Ernestine J. Rotan became a patient of the appellee obstetrics/gynecology medical group of Diane J. Egan, M.D., Raymon J. Parisi, M.D., and Arthur E. Kane, M.D., when she suspected she was pregnant. On her initial visit in September 1976, she was examined by Dr. Kane and told him she had a heart murmur that had been diagnosed in 1959. In relation to this heart murmur, Mrs. Rotan had never experienced any symptoms or pain, had never been hospitalized, was taking no medication, had never suffered any injury, disease, or illness to her heart, and had not been required to restrict her physical activities or diet.

Mrs. Rotan was expected to deliver her child in late May 1977, but she had a premature rupture of the membranes on April 2, 1977. She was given a cortisone medication by Dr. Parisi to decrease the possibility of lung problems for the baby since a premature birth was expected. The baby was born April 5, 1977 (delivered by Dr. Egan). A uterine culture of the mother and a culture of the suction material taken from the baby showed a "moderate growth" of group D streptococcus (enterococcus). Mrs. Rotan was given no antibiotic therapy when she ruptured the membrane or after the culture.[2]

[*] Associate Judge Belson has been drawn to replace Senior Judge Pair as a member of the division assigned to consider this appeal.

1. Appellants further argue that the trial judge abused his discretion when he denied appellants' motion for a new trial based on inadequacy of the record. The transcript does contain a multitude of errors by the stenographer. But appellant cannot identify material inaccuracies such that we can conclude the trial court abused its discretion in refusing to grant a new trial

based on insufficiency of the record. The cases cited by appellants, *Fickett v. Rauch,* 31 Cal.2d 110, 187 P.2d 402 (1947) and *Weisbecker v. Weisbecker,* 71 Cal.App.2d 41, 161 P.2d 990 (1945), both concern situations in which no transcript existed. In contrast, appellants rely heavily on the transcript in the instant case, inaccurate though it may be.

2. Appellee physicians presented expert testimony that Mrs. Rotan revealed no indications of infection either before or during the delivery of

Mrs. Rotan was discharged from the hospital on April 8, 1977. From that time on she had symptoms such as swelling in her feet, weakness, fever, pus draining from the nipples of both breasts, shortness of breath and incontinence of the bowels. She was examined by Dr. Egan on April 15. The lab report on the drainage from Mrs. Rotan's breasts showed a bacterial infection resembling a pathogenic bacterial growth. The lab report said that no antibiotic sensitivity test was done because the organism cultured out of the pus died. Mrs. Rotan was given a prescription for tetracycline but the symptoms worsened. She went to see the doctor again and this time was examined by Dr. Parisi. He told her to continue on tetracycline. Her condition became worse; by the time she went to Dr. Parisi again (two weeks later) she was experiencing clubbing of her nails. Dr. Parisi referred her to a neurologist (Dr. Restak). According to Mrs. Rotan, the neurologist only had a discussion with her, and did not examine her.

Mrs. Rotan's condition continued to worsen but when she returned to the doctor's office two weeks later (May 20, 1977) and was examined by Dr. Egan, she was told the doctor could find nothing wrong, and was prescribed no medication. Dr. Egan did, however, give her the names of three specialists. That same evening, Mrs. Rotan's temperature went up to 105 degrees, and she went to the emergency room at Greater Southeast Community Hospital. The emergency room physician (Dr. Nwaneri) took blood, urine, and breast fluid samples and told Mrs. Rotan she had a urinary tract infection and mastitis. He prescribed ampicillin. Upon experiencing no relief, on June 1, 1977, Mrs. Rotan went to the walk-in clinic at Johns Hopkins Hospital. The physician on duty immediately concluded she had bacterial endocarditis, or inflammation of the heart valve due to infection. She was hospitalized from June 1 to July 11, 1977. After her discharge, her condition worsened and she finally had to under-

go open heart surgery to replace her diseased and damaged aortic valve.

Mrs. Rotan and her husband filed this medical malpractice action on April 10, 1979, alleging that appellee doctors were negligent in their care, diagnosis, and treatment of Mrs. Rotan by failing to detect the infectious process in her bloodstream. Specifically, appellants contended at trial that Mrs. Rotan's congenital heart abnormality in combination with the ruptured membranes should have led appellee physicians to conduct a more thorough heart examination or administer prophylactic antibiotics. Appellants maintained that this negligence ultimately caused the bacterial growth on the heart valve which resulted in damage to the aortic valve such that it had to be replaced with a prosthesis in open heart surgery. The jury rejected these contentions and appellants seek review of the judgment and the order of the trial court denying a motion for a new trial.

## II

In this court appellants contend that the trial court improperly received into evidence outpatient records containing an opinion by a doctor not presented as a witness. They are concerned only with the improper introduction of one sentence contained in the five-week post-operative notes of Dr. Chandra of Johns Hopkins Hospital: "Her [Mrs. Rotan's] underlying problem had been subacute bacterial endocarditis *on a previously normal healthy valve.*"

The condition of the valve prior to the bacterial infection is significant because a critical question at trial was whether appellee physicians gave Mrs. Rotan "reasonable care" in light of her condition prior to being treated. If the valve was previously healthy, the doctors' treatment would presumably be found to meet the standard of reasonable care. If, however, the valve was damaged, arguably certain steps should have been taken by the doctors which were not (*e.g.*, administering prophylactic antibiotics). The parties offered con-

her child that would require treatment by prophylactic antibiotics. Experts also detailed the undesirable side effects which administration of

such antibiotics might have, including the effect of masking symptoms such that other dangerous conditions would go undetected.

flicting testimony with regard to the condition of the patient prior to being treated by appellee physicians. There is no dispute as to whether Mrs. Rotan told the doctors she had a heart murmur. The question is whether the doctors should have been alerted that it was not an innocent murmur. An innocent murmur is one which implies no valve damage, and would not suggest the need for prophylactic antibiotics.

Appellee physicians answer that the parties agreed to admit Johns Hopkins hospital records with no need for witness verification of the records. From notes scribbled by appellants' trial counsel in the margin of his motion for a new trial, it would appear that the agreement relied upon went specifically to out-patient records for certain dates and in-patient records for another set of dates. These notes do not indicate an agreement with respect to the date of the out-patient record involved here (September 25, 1977). Trial counsel for appellants is now deceased, and the court record throws no light on the question as to whether there was a separate agreement. With nothing further offered by appellees to demonstrate that the challenged statement comes within the ambit of this agreement, we conclude that appellees have failed to carry their burden of showing that it was properly received in evidence pursuant to an agreement.

■ Alternatively, appellees maintain that the statement was properly admitted under the business records exception to the hearsay rule. We disagree. The principle behind allowing exceptions to the hearsay rule for certain business records is that entries made in the regular course of business, that are the "routine reflections of day-to-day operations," or "the routine product of an efficient clerical system," *New York Life Insurance Co. v. Taylor*, 79 U.S.App.D.C. 66, 69, 147 F.2d 297, 300 (1944), are inherently trustworthy. The court in *New York Life* found a psychiatric diagnosis to be inadmissible under the rule, pointing out the danger that the right to cross-examination would be destroyed if the untested, very subjective observations

of persons whose credibility was not before the jury were accepted.

Appellee physicians argue, however, that the diagnosis of Mrs. Rotan's heart valve more closely resembles the facts in *Washington Coca–Cola Bottling Works v. Tawney*, 98 U.S.App.D.C. 151, 233 F.2d 353 (1956), where the record at issue was an observation of glass fragments and fissures in the patient's rectum. *Tawney* was distinguished from *New York Life* on the basis that it required only the ability to observe something "as plain to the trained eye as a compound fracture, and upon which competent physicians would not be likely to disagree." *Tawney, supra*, 98 U.S.App.D.C. at 152, 233 F.2d at 354 (footnote omitted). *See also Smith v. United States*, 337 A.2d 219 (D.C.1975) (lab report showing the presence of sperm in the patient's vagina deemed to be the type of record which was reliable and objective enough to be admissible).

We disagree. It simply cannot be said that ascertaining the *prior condition* of a heart valve after it has become so severely damaged that it had to be replaced constitutes a simple, routine observation comparable to the observation of glass fragments (*Tawney*) or sperm (*Smith*). There was disagreement between competent physicians on this issue, and even on whether such a determination could be made after the operation, since Dr. Donahoo, the cardiac surgeon who operated, testified that the valve had no damage prior to the infection, while Dr. Russo, a specialist in cardio-vascular diseases who followed Mrs. Rotan post-operatively, testified that infection had destroyed the valve and made it impossible to determine the state of the valve before the infection. Appellees also urge our reliance upon *Christensen v. Gammons*, 197 A.2d 450 (D.C.1964), which found that under the circumstances a diagnosis of cerebral thrombosis was sufficiently nonconjectural and non-complex that cross-examination of the doctor was not necessary. However, that court distinguished cases where doctors can and do come to disagreements over their opinions as to diagnosis. Indeed, it was on that basis that we distinguished *Christensen* in *Adkins v. Morton*,

494 A.2d 652, 662 (D.C.1985), noting that under the circumstances in *Adkins* there was disagreement over the etiology of the patient's condition even among the experts called by the party offering the record in evidence.

In the instant case, there was not only disagreement among the witnesses concerning the prior condition of Mrs. Rotan's heart, but, as noted, the statement at issue was a difficult diagnostic judgment of great complexity. Even more important, however, is the fact that the statement which appellants contend was improperly admitted here embodies a conclusion that Dr. Chandra could not possibly have come to as a result of personal observation. Dr. Chandra was viewing the patient some five weeks after the open heart surgery during which time the artificial valve was put in place. She did not ever see the valve, and there was really no basis for her judgment that the valve was "previously healthy"; apparently, her conclusion was gleaned from another source.

Although we find the trial court erred in admitting Dr. Chandra's statement as to the prior condition of Mrs. Rotan's heart valve under the business records exception to the hearsay rule, we conclude that the admission was harmless. Prejudice arising from the improper receipt of evidence may be mitigated when the same information, or very nearly the same information, has been properly placed before the jury through another witness or in a different form. *See Boyle v. Smith*, 64 A.2d 428, 431 (D.C.1949). Dr. Chandra's hearsay statement was merely cumulative evidence. Earlier at trial, Dr. Donahoo testified to the condition of Mrs. Rotan's heart valve before the bacterial infection had set in. He stated that it was previously a normal, healthy valve. Dr. Donahoo was subject to full cross-examination. Dr. Chandra's report said nothing new, nor did it buttress Dr. Donahoo's testimony in any significant way, especially given that Dr. Chandra could have no personal knowledge

whatsoever of the condition of Mrs. Rotan's heart valve prior to the onset of infection.

### III

Appellants challenge various rulings by the trial court concerning the admission of expert testimony. Appellants first claim that two of appellees' expert witnesses failed to state their opinions with sufficient certainty, contending that this testimony, along with references to it in closing argument, allowed the "spectre of contributory negligence" to enter the case.

The trial court agreed with appellants' characterization of the testimony as "speculative," and found it did not constitute sufficient evidence to make out the affirmative defense of contributory negligence.[3] The court thus refused appellee physicians' request for an instruction on contributory negligence, and indicated the theory was not to be argued to the jury. Appellants argue however, that because there were several questions directed toward the experts, as well as Mrs. Rotan, on the subject of why she did not contact the doctors to whom she had been referred by appellees and because appellees' closing argument raised the question, the issue was before the jury, albeit indirectly.

We share appellants' concern that the more limited abilities of patients not be pitted against the knowledge and skill of physicians in these situations. As this court stated in *Morrison v. MacNamara*, 407 A.2d 555, 567–68 (D.C.1979):

> In the context of medical malpractice, the superior knowledge of the doctor with his expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments, negates the critical elements of the defense, *i.e.*, knowledge and appreciation of the risk. Thus, save for exceptional circumstances, a patient cannot assume the risk of negligent treatment.

**3.** Appellee doctors wanted to show that Mrs. Rotan caused or contributed to the progress of the bacterial infection attacking her heart be-

cause she failed to see a neurologist or internist per appellees' referral.

The court adds, "These same principles are equally valid with respect to the defense of contributory negligence in medical malpractice." *Id.* at 568, n. 11. *See also Martineau v. Nelson*, 311 Minn. 92, 247 N.W.2d 409, 415 (1976) ("Both courts and text writers have emphasized, however, that the availability of a contributory negligence defense in a malpractice case is limited because of the disparity in medical knowledge between the patient and his doctor and because of the patient's right to rely on the doctor's knowledge and skill in the course of medical treatment").

Here, however, we find that appellants have failed to demonstrate any actual prejudice accruing from the admission of this testimony and appellees' remarks in closing argument. Not only was there no instruction on contributory negligence but the testimony at issue here, as appellee readily admits, was quite vulnerable to attack.[4]

4. Consider the speculative nature of the responses in the following colloquies:

[DEFENSE ATTORNEY]: Doctor, based upon your review of the office records of Doctors Parisi, Kane, and Egan in relationship to their care and treatment of Mrs. Ernestine Rotan, and based upon Mrs. Rotan's referral to Doctor Restak, neurologist, and assuming that for whatever reason no examination was ever conducted by Dr. Restak; and also assuming that Mrs. Rotan was given the names of three internists on May 20th, 1977, to see for complaints that she had; and further assuming that Mrs. Rotan did not contact Dr. Yosef, a physician referred to her by the emergency room physician whom she saw on the evening of May 20th, 1977; do you have an opinion within a reasonable degree of medical certainty as to whether or not her seeing these other physicians caused or contributed to the cause of the delay and diagnosis in the condition of sub-acute bacterial endocarditis by any or all of the physicians?

[PLAINTIFFS' ATTORNEY]: Objection.

THE COURT: Overruled, go ahead, Doctor.

THE WITNESS: In reading the records on Mrs. Rotan I find far back in February she seemed to be quite hostile to the doctors. And this seemed to have been done through much of the records, although, why she was hostile never anything brought out about that. I think Doctor Parisi asked her in February at the time she was having a lot of emotions why are you angry and hostile? And when he sent her to the neurologist, you are asking in medicine help from anyone. I think it is unfortunate and I feel sorry, if she had gone someone might have picked up an answer. I have seen this happen with even internists, somebody gives us the right answer. I don't know why and particularly the internist may have something, may have some bolts of these conversations, I don't know; I will never know. I wish she had gone and seen some of them. I think it might have helped her.

[PLAINTIFFS' ATTORNEY]: I object to the answer and move that it be stricken as not responsive.

THE COURT: No, I am going to let the answer stand. Go ahead.

[PLAINTIFFS' ATTORNEY]: Do you have an opinion that her failure to see these physicians contributed to the inability of these physicians to diagnose her condition of sub-acute bacterial endocarditis prior to June 1, 1977?

[WITNESS]: I can't answer that because actually we don't know, the answer might have come from these persons, but one of them might have helped. I used all of the consultations I can get. Fortunately I have been in the building where there is a cardiologist and I send people real quickly. I think you can get help from anyone along this line, this is what they were trying and she shouldn't have stepped in to interfere with these—

[PLAINTIFFS' ATTORNEY]: I will object and ask that the answer be stricken.

THE COURT: I will strike the last portion of the answer, what she shouldn't have done.

\* \* \* \* \* \*

[DEFENSE ATTORNEY]: Do you have an opinion within a reasonable degree of medical certainty as to whether or not based upon the symptoms Mrs. Rotan presented as to whether or not these Doctors should have considered sub-acute bacterial endocarditis in a differentiating diagnosis based upon the symptoms that she presented?

[WITNESS]: From everything I have read in this case there is absolutely no reason that would have been considered as a differential diagnosis.

[DEFENSE ATTORNEY]: Doctor, at this time I would like you to assume in addition to assuming that she was referred to Doctor Restak, a neurologist, and the three interns. I would like you to further assume that she was given the name of another physician at the emergency room on the evening of May 20th, 1977.

I want you to further assume that she at no time contacted either of the internists nor the physician whose name was given to her on the night of May 20th.

Sir, do you have an opinion based upon a reasonable degree of medical certainty as to whether or not her not seeking any of these physicians caused or contributed to the delay in diagnosing the condition of sub-acute endocarditis?

[THE WITNESS]: It most certainly is conceivable if she had seen one of the three internists to whom she was referred that perhaps earlier

The cliche "damning with faint praise" is not inapposite. In rendering their opinions in such tenuous terms, the experts may have done the doctors' defense more harm than good. By falling short of stating their opinions within a reasonable degree of medical certainty, the witnesses afforded appellants' counsel the opportunity to establish through cross-examination that the doctor, in fact, did not even have an opinion in this regard, or simply to make that argument to the jury, which appellants' counsel did.[5]

## IV

Appellants further allege that the trial court erred in allowing appellees' experts, Drs. Donahoo and Nachnani, to testify on matters that were not contained in their answers filed pursuant to Super.Ct.Civ.R. 26(b)(4). Appellees had filed a Supplemental 26(b) statement which said Dr. Donahoo would be testifying as to his review of the records and observations and as to his conclusion that, at the time of the surgery, there were no congenital valve abnormalities. At trial, however, Dr. Donahoo responded to several questions concerning Mrs. Rotan's symptoms of "cerebral dysfunction."[6] Appellants argue that this testimony exceeded the scope of what the 26(b)(4) statement indicated Dr. Donahoo would testify to.

We need not decide this question. The testimony of which appellants complain

was relevant only with regard to damages. Appellees produced the evidence on "cerebral dysfunction" only to counter Mrs. Rotan's attempt to prove aggravated injuries. Such evidence, bearing solely on damages, has nothing to do with liability. Since the jury never reached the issue of damages, but decided there was no negligence, and thus no liability, the admission of the evidence, if error, was harmless.

■ Without identifying any specific testimony which they claim was erroneously admitted, appellants also complain that the admission of certain testimony of Dr. Nachnani was reversible error. Appellants argue that Dr. Nachnani's testimony was not sufficiently identified in the appellees' response to appellants' discovery request, and that appellants were forced to take Dr. Nachnani's deposition the night before his appearance at trial. However, appellees had named Dr. Nachnani as a witness in their Supplemental Answers to Interrogatories more than a full year prior to trial, and again on May 21, 1980, in their Pretrial Statement. Appellants filed no pretrial motions demanding further discovery or noting any complaints concerning the sufficiency of appellants' response at that time (appellees had stated that Dr. Nachnani, as well as all other named experts, would give testimony concerning standard of care and causation), and registered no objection before the doctor testified at trial. Under these circumstances, we cannot find that

---

symptoms, or an early indication of sub-acute bacterial endocarditis might have been picked up by the internists.

[PLAINTIFFS' ATTORNEY]: Your Honor, I must object to that. The question is highly speculative and anything might be conceivable or might be possible. And I would move to strike the testimony and ask for an instruction to the jury.

5. Appellants suggest that the trial court had a duty to strike the offending testimony or give a limiting instruction to the jury. We do not find the trial court was required to adopt this solution. Instead, its warning that the actions of Mrs. Rotan were to be argued only with regard to causation and not in terms of contributory negligence was sufficient to prevent prejudice:

[DEFENSE COUNSEL]: Now, one final question I had concerning argument. The court

denied my instruction concerning contributory negligence, but I assume that does not foreclose me from arguing to the jury her actions in regard to this?

THE COURT: I have no problem about her actions. I think her actions could well be argued as being on the doctors' liability as far as their own fault.... I don't want contributory negligence. I don't want voluntary assuming of risk or legal concept argument. I have no problem with you arguing the facts that she did interfere with materially a course of conduct taken by the doctors which was one of the standards.

6. In order to prove further damages, appellants attempted to show at trial that, after installation of the new heart valve, Mrs. Rotan experienced symptoms of reduced blood flow to the brain as a result of cerebral dysfunction.

admission of the testimony constituted reversible error.

■ Appellants also challenge the court's acceptance of two of appellees' witnesses as qualified experts. The decision to admit expert testimony lies within the sound discretion of the trial court, whose ruling will be sustained unless clear abuse of discretion is shown. *Payne v. Soft Sheen Products, Inc.*, 486 A.2d 712 (D.C. 1985) (testimony of industrial psychologist excluded since jury capable of making commonsense determination). We cannot conclude the trial court abused its discretion in admitting the testimony of Drs. Crane and Nachnani. Appellants complain that Dr. Crane testified as to infectious diseases, when only ten percent of his present practice is devoted to infectious disease. They neglect to note, however, that the expert had extensive past experience in the field, that the witness had a residency in the specialty and that he had been an instructor in the field. Similarly, Dr. Nachnani was offered and qualified as an expert in internal medicine and cardiology. However, he testified that obstetricians and gynecologists referred their patients to him on a regular basis, and his testimony concerned what would be required of obstetricians and gynecologists to treat only certain conditions (the symptoms of which would certainly fall within the specialities of internal medicine and cardiology, such as in the present case).[7]

## V

Finally, appellants challenge the propriety of the trial court's action in invoking a statutory privilege from Maryland on behalf of a witness testifying in the Superior Court of the District of Columbia. A Dr. William Cooper was called by appellees, defendants below, to give expert testimony in the field of obstetrics and gynecology. Appellants (plaintiffs below) sought to cross-examine the doctor with respect to a meeting to discuss Mrs. Rotan's medical case which was attended by several of appellees'/defendants' experts. Appellees' counsel objected, invoking a medical review panel privilege available under Maryland law, Article 43, Section 123A, Annotated Code of Maryland (1980). The trial judge sustained appellees' objection upon authority of the Maryland statutory privilege.

Appellants submit that the trial judge committed error by invoking a rule of procedure from a foreign jurisdiction. We need not decide this question; by their own admission, appellants "never intended to elicit more than the facts of the occurrence of the meeting, that defendants' experts were in attendance, and that Mrs. Rotan's case was discussed." Appellants concede that the testimony they sought at trial from Dr. Cooper "might have been only attributable to the weight to be accorded any of defendants' experts testimony." Under these circumstances, we think that the trial court's invocation of the Maryland statute, if error at all, was not reversible.

*Affirmed.*

7. Appellants also allege that portions of Dr. Nwaneri's deposition should not have been admitted because of his reference to his "usual instruction" to patients to consult a private physician; accordingly; the "usual instruction" resulted in Mrs. Rotan's consultation with Dr. Yusef. Appellants complain too of a reference to the doctor's own notations in the emergency room records.

Even if the admission of these portions of Dr. Nwaneri's deposition was error, appellants were not prejudiced thereby. Mrs. Rotan herself testified that Dr. Nwaneri's referred her to a Dr. Yusef. As to the second admission, counsel conceded that the testimony was in evidence already and in fact added nothing.