**Tyrone J. SMITH, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 7711.**

District of Columbia Court of Appeals.

Argued March 12, 1974.

Decided April 29, 1975.

**220**

Frederick H. Weisberg, Washington, D. C., appointed by this court for appellant. James E Brown, Washington, D. C., also entered an appearance for appellant.

William I. Martin, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry and C. Madison Brewer, Asst. U. S. Attys., were on the brief, for appellee.

Before KERN and YEAGLEY, Associate Judges, and HOOD, Chief Judge, Retired.

KERN, Associate Judge:

Appellant challenges his conviction for carnal knowledge of a twelve-year-old female in violation of D.C. Code 1973, § 22–2801 on the ground that the trial court erroneously admitted into evidence reports of certain laboratory tests without which evidence the prosecution case would have been insufficient. The government's evidence at trial consisted of:

Testimony by the complainant that appellant had slapped her and then forced her to have sexual intercourse with him while they were both in the house of a friend;

A police officer's testimony that he had responded to the scene within two minutes of receiving the dispatcher's call triggered by the complainant telephoning the police and found her "to be nervous, excited";

Testimony by Dr. Stephen Ludwig, who was in charge of the emergency room at Children's Hospital and who examined her there on the day of her call to police, that she had "some abrasions in the left cheek and left side of the chin" and "large amounts of white milky secretions in the posterior portion of her vagina", a sample of which substance he himself took to the hospital laboratory and logged in for the purpose of "culture and other chemical analyses";

Further testimony by Dr. Ludwig that these tests were "the standard protocol . . . we have at the hospital";[1]

Testimony by Mrs. Elizabeth F. Hill, the hospital's Assistant Director of Medical Records, that "a laboratory test done as a result of a physical examination" of a patient would be in that patient's "record folder" which is regularly maintained by the hospital on all its patients and it is a part of the hospital's regular business to make such records;

A one-page form report in the complainant's hospital record folder, denominated "Surgical Pathology Report", bearing the imprint of a signature of a M.D. pathologist, "M. Singh", under date of January 21, 1973 (the day of the alleged sexual assault), which contained among others, the statements: "Specimen submitted by Dr. Ludwig", "Microscopic Examination: Pap smear shows squamous epithelial cells and numerous spermatozoa in both the smear from the cervix and from the vagina", and "Diagnosis: Pap smear showing spermatozoa"; and,

A one-page form report over the imprinted signature of "Sanford L. Leikin, M.D., Associate Director, Clinical Laborator [sic]", which contained among others, the statements "Acid Phosphatase Markedly Elevated. Over 25 Bodansky Units" and "Smear for Gram Stain . . . Occasional Spermatozoa".

The above summary of the evidence adduced by the government at trial clearly demonstrates that the two hospital reports were essential to appellant's conviction. Appellant now argues that these two reports should not have been admitted into evidence at trial because (1) the government failed to prove an unbroken chain of custody from the time Dr. Ludwig took the sample from complainant's body in the Children's Hospital emergency room to the time of the chemical analysis and recording of the result in the laboratory of the hospital, and (2) the Federal Business Records Act (the Act)[2] is not applicable because the tests performed were not of a "routine" nature. The applicability of the Act is the crucial issue raised by appel-

---

1. Dr. Ludwig's testimony describing the test was:
   There are cultures to look for specific bacteria or germs that might be causing such secretions, taken both from the vagina, the cervix, and the urethra. There are slides made of such secretions to look for cells of a pathologic type. There are also chemical analysis [sic] which looks for a specific enzyme called acid phosphatase, which is an enzyme that is found in sperm.

2. 28 U.S.C. § 1732 (1970).

lant's arguments since it is recognized that if the Act applies then the chain of custody is established by compliance with that Act. *Cf.* Gass v. United States, 135 U.S. App.D.C. 11, 15–16, 416 F.2d 767, 771–72 (1969); Wheeler v. United States, 93 U. S.App.D.C. 159, 162–63, 211 F.2d 19, 22–23 (1953), cert. denied, 347 U.S. 1019, 74 S. Ct. 876, 98 L.Ed. 1140 (1954).

We turn to the Act which provides in applicable part:

In any court of the United States . . . any writing or record . . . made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in a regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.[3]

■■ It is well established that routine hospital records fall within the purview of the Act when they are made in the hospital's regular course of business and if it is the hospital's regular course of business to make such records. Gass v. United States, *supra*; Wheeler v. United States, *supra*; 5 Wigmore, Evidence § 1707 (3d ed. (1940); McCormick, Evidence § 313 (2d ed. 1973). In essence, the Act requires that "the medium" through which the information is preserved be in systematic use and the method by which the information ("the message") is obtained be routinely employed by the hospital. Gass v. United States, *supra* at 16, 416 F.2d 767.

■ We are of opinion that the testimony of Mrs. Hill established, as required by the Act, that the records pertaining to complainant and introduced at trial were of the type systematically kept by the hospital.[4] Likewise, we believe the characterization of the tests by Dr. Ludwig as "the standard protocol . . . we have at the hospital" established that they were ones routinely used by the hospital.

Appellant argues that the two lab reports of the presence of sperm in complainant's body constituted the results of tests requiring employment of skill and judgment, which tests do not come within the purview of the Act. In sum, he argues, the test results here did not constitute an "act, transaction, occurrence, or event," as these terms are employed in the Act.

The Supreme Court noted in Palmer v. Hoffman, 318 U.S. 109, 113–14, 63 S.Ct. 477, 87 L.Ed. 645 (1943), the Act was designed to facilitate the admission of records which experience has shown to be quite trustworthy because they comprise routine reflection of daily operations.

Hospital records have been held to be especially trustworthy because:

Human life will often depend on the accuracy of the entry, and it is reasonable to presume that a hospital is staffed with personnel who competently perform their day-to-day tasks. To this extent at least, hospital records are deserving of a presumption of accuracy even more than

---

3. 28 U.S.C. § 1732(a) (1970).

4. Although the hospital used a standard form entitled "Medical Examination of Sexually Assaulted Persons", perhaps implying a non-medical reason for the test, the form also contained a section to indicate whether testing for sperm, gonorrhea and syphilis had been done. All these tests were marked as having been completed. This, together with Mrs. Hill's testimony that these records were not kept specifically for use by the police department and the evidence contained in the exhibits of record about the hospital's follow-up procedures in this type of case, satisfy us that the records here were not kept *primarily* for purposes of litigation.

other types of business entries. (Footnote omitted.) [Thomas v. Hogan, 308 F.2d 355, 361 (4th Cir. 1962).]

In this jurisdiction the Act has been held *inapplicable to* certain kinds of medical evidence; thus, the federal circuit court held in New York Life Ins. Co. v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297 (1944), that the written record of an expert medical opinion as to a psychoneurotic disorder without the presence of the psychiatrist for cross-examination was not admissible under the Act. In Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 .(1957), cert. denied, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), the appellate court held that in a criminal prosecution wherein the defendant pleaded not guilty by reason of insanity, the trial court properly refused to admit under the Act a record of a written *psychiatric* opinion that defendant was suffering from a mental disease or defect prior to the commission of the alleged offenses. However, in Washington Coca-Cola Bottling Works, Inc. v. Tawney, 98 U.S.App.D.C. 151, 233 F.2d 353 (1956), the federal circuit court emphasized the distinction between a recorded observation by doctors of glass fragments in the human body and the medical opinion as to a psychiatric disorder in New York Life Ins. Co. v. Taylor, *supra*; the court commented that observations of physical facts "upon which competent physicians would not be likely to disagree" were admissible under the Act. Washington Coca-Cola Bottling Works, Inc. v. Tawney, *supra*, 233 F.2d at 354. And in both Wheeler v. United

States, *supra*, a carnal knowledge case, and Gass v. United States, *supra*, a rape and robbery case, the court held that slides containing vaginal smears which had been tested by a hospital laboratory and found positive for the presence of intact sperm were admissible under the Act.[5]

We are satisfied against the backdrop of the decisions noted above and upon the particular facts of this case that the admission of the two reports consisting of the results of the tests conducted here by Children's Hospital was not error. We view these tests not as diagnostic opinions but rather observations of factual data "upon which competent physicians would not be likely to disagree". *See* Henson v. State, 332 A.2d 773, 775–76 (Del.Supr.1975). We are constrained to comment, however, that when the government offered into evidence the two laboratory reports it proffered to the trial court that Dr. Ludwig would testify about the testing procedures followed with respect to the specimen he had taken. However, the prosecutor subsequently failed to develop by examination of the witness his explication of the relative routineness of the test and its degree of medical reliability.[6]

While we are able to affirm the conviction under the particular circumstances here, we view the practice followed in this case as one to be avoided by the government in future prosecutions of this nature.

Affirmed.

---

5. In these cases, unlike the instant case, the technician conducting the tests did testify.

6. He merely referred in his testimony to the tests, without more, as "the standard protocol . . . we have at the hospital". Appellant did not on cross-examination of Dr. Ludwig probe the nature of the tests conducted.