**Sherman DURANT, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**No. 85–1592.**

District of Columbia Court of Appeals.

Argued April 6, 1988.

Decided Dec. 16, 1988.

Syrie Davis, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Dennis R. Carluzzo, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell, Elizabeth Trosman, and John P. Dominguez, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge,* and NEWMAN and BELSON, Associate Judges.

---

* Judge Rogers was an Associate Judge of the court at the time this case was argued. Her status changed to Chief Judge on November 1, 1988.

ROGERS, Chief Judge:

On appeal from his conviction by a jury of assault with intent to rob, D.C.Code § 22–501 (1981), appellant Sherman Durant contends that the trial judge abused his discretion in admitting for impeachment medical records showing the use of phencyclidine (PCP) without expert medical testimony. At trial, Durant denied being under the influence of PCP on the day of the alleged offense and the only evidence contradicting this claim was a urine test that detected an unspecified quantity of PCP the day after the offense. Defense counsel made an unrebutted proffer that trace amounts of PCP can be detected in urine long after the effect of the drug has dissipated. We hold that the trial court erred in admitting a medical diagnosis of PCP intoxication as a business record within the exception to the hearsay rule. We further hold that, while other medical records were admissible within that hearsay exception, the trial judge abused his discretion in ruling that the government's proffer of the medical records provided a sufficient evidentiary foundation to be used as extrinsic evidence for impeachment purposes since the records did not link the presence of PCP in Durant's urine the day after the alleged offense to his behavior and his ability to recall events surrounding the offense. Because the admission of the record substantially prejudiced Durant, we reverse.

## I

The charge against Durant arose out of an incident involving Earl Richards, a taxi cab driver. On February 14, 1984, Richards was driving his cab when he observed Durant walking in the middle of the street and waving his arm in the air. According to Richards, when he pulled his cab over to the curb to avoid hitting Durant, Durant opened the front passenger door and ordered Richards out of the cab, telling him that he was from the FBI and that he was carrying a bomb. As Durant slid across the front seat, Richards turned off the engine and attempted to take his keys from the ignition, but claimed Durant grabbed his hand and the keys fell to the floor. In an effort to protect his cab, Richards said he got out of the vehicle, opened the hood, and attempted to disconnect the ignition wires. Durant, according to Richards, then rushed out of the cab, slammed the hood down, and got back into the driver's seat. As Durant started the engine, Richards said he jumped into the passenger seat and grabbed the gear shift and steering wheel to stop Durant from driving away. Durant resisted, Richards claimed, and as he and Richards struggled, the cab accelerated onto the curb and stopped.

As the two men were struggling, Officer Ronald Williams arrived. Richards told Williams that Durant claimed to have a bomb and was trying to steal his cab. Richards testified that Durant tried to walk away after Officer Williams arrived, but was impeached with his grand jury testimony that the police pulled Durant from the cab after hearing of his attempt to steal it. Officer Williams initially testified that Durant tried to run away, but admitted on cross-examination that Durant did not get out of the cab until Williams approached him. Richards also testified that Durant's eyes looked "real poppy" and that he appeared "real jittery, like he was jumping ... like he was not himself." Officer Williams said that he recalled nothing unusual about Durant's eyes or posture while transporting him to the station.

Durant testified that on February 14, 1984, he was on his way to the Veteran's Administration hospital to check in for treatment of a continuing illness. He was carrying the belongings that he might need for his hospital stay, including a black bag.[1] Durant hailed Richards' cab, and when Richards pulled over, Durant told him his destination and Richards nodded his assent. Durant put his luggage in the back seat and then got in the front seat.

1. The black bag did not contain a bomb but did contain three photo albums, several language books, a pair of gloves, an umbrella, a pencil and paper, a comb, a toothbrush and other personal items. In addition, Durant was carrying two pairs of pants, a jumpsuit, a sportcoat, an overcoat and an attache case.

Richards started to drive, but after going a short distance announced that he had to pick up his girlfriend. Durant asked to be taken directly to the hospital because he was beginning to feel sick. Richards stopped the cab and ordered Durant to get out. When Durant refused, Richards shoved him and Durant shoved him back. After exchanging words, Richards got out of the cab and then reached back in for his keys. Durant struck Richards' hand believing that Richards was reaching for something with which to hit him. After the police arrived, Durant waited a few minutes while Richards spoke to the police and then pulled his belongings from the back seat and walked over to the police and Richards: Durant denied taking the keys from the ignition and said they remained in the ignition even while Richards spoke to the police.

After Durant's direct examination was completed, the prosecutor requested permission from the trial judge to cross-examine Durant about whether he was under the influence of PCP on February 14 and whether he had told a doctor on February 20 that he was unable to recall the facts surrounding the offense and his arrest. The prosecutor also sought permission, in the event of Durant's denial, to complete the impeachment by introducing in rebuttal, through a medical records custodian, appellant's redacted medical records to show (1) a doctor's entry that Durant was suffering from PCP intoxication on February 15, the day after the offense, (2) a lab report indicating the detection of an unspecified amount of PCP in Durant's urine on the day after the offense and the accompanying diagnosis of PCP intoxication, (3) a nursing entry about Durant's bizarre behavior on the day after his arrest, and (4) an excerpt of a conversation with a doctor on February 20 in which Durant stated that he could not remember what he was doing at the time of the offense. The prosecutor proffered this evidence to explain Durant's behavior during the offense and to challenge his ability to remember the incident.

Defense counsel objected to the admission of this evidence on several grounds. Although agreeing that cross-examination of Durant as to whether he was under the influence of PCP at the time of the offense was proper and relevant to his ability to perceive and remember, counsel argued that it would be improper for the government to link evidence of PCP use to Durant's behavior on February 14. Defense counsel noted that the urinalysis test relied upon by the government was only a qualitative, not a quantitative test, that it was merely a preliminary screening requiring confirmation, which apparently was not done, and that a contemporaneous blood test had failed to detect any PCP in Durant's body. Defense counsel proffered that researchers have determined that traces of PCP can be retained in the body for many days after ingestion, and argued, therefore, that in the absence of explanatory medical testimony based on Durant's medical records, the probative value of the evidence of PCP use was clearly outweighed by its prejudicial impact. He also argued, citing *New York Life Ins. Co. v. Taylor*, 79 U.S.App.D.C. 66, 147 F.2d 297 (1944), that those portions of the medical records which contained psychiatric opinions were inadmissible hearsay in the absence of live testimony subject to cross-examination. As to Durant's statement to a doctor regarding his lack of recollection, defense counsel maintained that the statement was explainable based on counsel's previous instruction to Durant not to discuss the case with medical personnel.

The trial judge ruled that the government would be allowed to cross-examine Durant on his use of PCP for the purpose of testing his ability to remember the events surrounding the charged offense. If Durant denied such usage, then the government would be permitted to use the medical records as extrinsic evidence to impeach him. The judge further ruled that the government would not be allowed to link Durant's behavior on the date of the offense to PCP intoxication.

Durant then resumed the witness stand for cross-examination. After testifying that Richards' cab was never on the sidewalk while he was on the scene, and denying that he had claimed to be an FBI agent

or said he had a bomb, Durant was asked whether he remembered "passing out" in the squad car on the way to the police station. Durant replied that he did not pass out but was knocked unconscious. The prosecutor asked Durant whether Richards' testimony about Durant's "eyes bugging out and fidgeting and trembling" was an accurate description of his behavior. Durant denied acting in such a manner. Durant was then asked whether he had an accurate memory of the events of February 14, and he replied that "As long as I was not unconscious, I recall." The cross-examination continued: .

Q. Were you unconscious when Officer Williams, or a police officer, put you in the police car?

A. I was knocked unconscious from the outside of the car.

\* \* \* \* \* \*

Q. [O]n February the 20th, do you recall ever relating to a doctor at D.C. General Hospital, that you were unable to remember the events that happened that caused your arrest?

\* \* \* \* \* \*

A. No, sir, I did not tell no doctor that, under no circumstances.

\* \* \* \* \* \*

Q. Mr. Durant, were you under the influence of PCP on *February 14th,* 1984 at about five o'clock in the evening?

A. No, sir, I was not under the influence of no type of drug whatsoever.

Q. Mr. Durant, did you know that at the D.C. General Hospital, they performed tests on you that found PCP—

[objection overruled]

\* \* \* \* \* \*

A. I was aware that Doctor Mark Moseley informed me that they have— they did find PCP within my system. . . . I deny using it.

**2.** In requesting permission to cross-examine Durant about his use of PCP, the prosecutor said he wanted to avoid getting into a collateral discussion of Durant's claim that police brutali-

Q. [D]o you deny that you were under the influence of PCP on *February the 14th,* 1984?

A. I deny I was under—I definitely deny I was under the influence of PCP at any time.

Q. Do you recall that—at the hospital, that you were in such an agitated state *from the ingestion of PCP* that you had to be physically restrained in the hospital bed with three leather straps— [Emphasis added]

Defense counsel objected and moved for a mistrial on the ground that the prosecutor's line of inquiry violated the judge's ruling that the government would not be allowed to link the PCP evidence to Durant's behavior and that the question exceeded the scope of direct examination. The trial judge overruled the objection, explaining that because Durant had given unanticipated testimony that he was knocked unconscious by police officers, the government was entitled to "show what his condition was on [February 14, 1984]." [2] The prosecutor then asked Durant whether he remembered being in such a mentally agitated state that he had to be tied to a bed with leather straps at the hospital, to which Durant replied "I remember being tied down on a bed in the emergency room in D.C. General Hospital."

On redirect examination, defense counsel attempted to rehabilitate Durant by eliciting that Durant had been instructed by counsel on February 17 or 18 not to discuss the facts of the case with anyone and that his conversation with a doctor on February 20 occurred after receiving that advice. Defense counsel also asked him whether the police or medical staff had handcuffed him while he was at the hospital, to which he responded that the police had placed him in handcuffs.

In rebuttal, the government called the Registrar Technician in the Medical Records Division of D.C. General Hospital, who read into evidence five discrete por-

ty had resulted in his being in a wheelchair, a subject that was not raised by the defense but was discussed in the medical records.

tions of the records.[3] Specifically, he told the jury that (1) on February 15, 1984, the day after Durant was admitted to the hospital, Durant's urine tested positive for PCP, (2) a nursing entry on the admission notes made that same morning stated Durant "was admitted to ... [the] Medical Intensive Care Unit, by stretcher, from [the] emergency room, accompanied by a nurse and doctor and sergeant and Metropolitan Department police officer. He was crying out and screaming, and he was ... combative, and [he] was placed in a three-pronged leather restraint, and handcuff[ed] on the left ankle. Also, IV in the left arm. He was given medication and placed on the cardiac monitor and he was biting on the cables[,]" (3) a final laboratory report dated February 16, 1984, stated "PCP intoxication," (4) a consultation record by Dr. Yoshida on February 20, 1984, stated "[Durant] didn't remember what had happened," and (5) a discharge summary and referral dated February 24, 1984, stated "[t]he patient has been discharged back to the custody of the police with the following diagnosis ... PCP intoxication." The trial judge immediately instructed the jury that Durant's prior inconsistent statement to Dr. Yoshida could be used only to assess Durant's credibility. Regarding the PCP use, the judge instructed the jury that if it found Durant "used or was under the influence of PCP on [the date of the offense], that evidence may only be considered by you in determining whether Mr. Durant's ability to accurately recall the events of that day were [sic] impaired ... as it may relate to his credibility and his ability to remember the events." On cross-examination, defense counsel elicited that a blood serum analysis conducted at the same time as the urine test showed that no PCP was detected in Durant's blood. A notation made on the test results read "This is a screening test only. Recommend confirmation on all positive results."

**3.** Only the portions of the medical records which were read by the technician were admitted into evidence. Durant's complete medical records are part of the record on appeal.

## II

Durant contends that the trial judge abused his discretion in admitting for impeachment, after Durant denied on cross-examination that he was under the influence of PCP on the day he was arrested, four discrete portions of Durant's medical records showing that Durant was under the influence of PCP for several days after the events precipitating his arrest.

### A.

**1. *The diagnosis.*** Durant maintains that the trial judge erroneously admitted the discharge summary stating a medical opinion that Durant was diagnosed as suffering from PCP intoxication under the business records exception to the hearsay rule. Super.Ct.Civ.R. 43–I(a)[4] provides in relevant part:

> Any writing or record ... made as a memorandum or record of any act ... or event, shall be admissible as evidence of such act ... or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act ... or event....

Under *New York Life Ins. Co. v. Taylor, supra,* 79 U.S.App.D.C. 66, 147 F.2d 297 (interpreting a statutory precursor of Super.Ct.Civ.R. 43–I) and its progeny, certain hospital records are admissible under the business records exception to the hearsay rule because they reflect "medical facts and routinely performed procedures" and are therefore inherently trustworthy. *Adkins v. Morton,* 494 A.2d 652, 662 (D.C. 1985) ("The test for admissibility is whether the records are composed solely of 'regularly recorded facts as to the patient's condition or treatment on which the observations of competent physicians would not differ.'") (citation omitted); *see Rotan v. Egan,* 537 A.2d 563, 566–67 (D.C.1988).

The court in *New York Life* drew a distinction between diagnosis based purely on objective observations and diagnoses in-

**4.** Super.Ct.Civ.R. 43–I(a) is made applicable to criminal cases by Super.Ct.Crim.R. 57(a).

volving subjective judgment or conjecture. 79 U.S.App.D.C. at 75, 147 F.2d at 306. In determining a particular psychiatric diagnosis to be inadmissible, the court observed:

> The diagnosis of a psychoneurotic state involves conjecture and opinion.... It is no reflection upon the profession of psychiatry to say that it necessarily deals in a field of conjecture.... It is difficult to conceive of records in which the right of cross-examination is more important than the conjectures of a psychiatrist on a psychoneurotic condition.

*Id.* at 73–74, 147 F.2d at 304–05; *see Lyles v. United States,* 103 U.S.App.D.C. 22, 28, 254 F.2d 725, 731 (1957), *cert. denied,* 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958) (psychiatric opinion inadmissible). In the instant case, the discharge summary diagnosis for Durant was redacted so that the jury was only informed of the diagnosis of PCP intoxication. The summary also indicates that based on the same symptomatology, Durant was additionally diagnosed as suffering from histrionic personality disorder with hysterical paraparesis. Whether Durant was suffering from PCP intoxication on February 14 was a key issue at the trial. *See Adkins v. Morton, supra,* 494 A.2d at 662. Cross-examination was vital to explore the basis of that diagnosis, particularly since it was intertwined with a second diagnosis that Durant suffered from an underlying mental disorder. Therefore, on the facts of this case, we conclude that the diagnosis of PCP intoxication is the type of psychological diagnosis for which *New York Life* requires the availability of live testimony subject to cross-examination.

The government's reliance on *Sullivan v. United States,* 404 A.2d 153 (D.C.1979), is misplaced. There the court stated:

> [I]t is obvious that medical entries as to complainant's condition—his appearance, physical signs such as pulse, respiration, etc., *and the resulting diagnosis* —constitute a record admissible under Rule 43–I(a). Such entries are routinely made in the "regular course" of admitting patients, and a hospital fits firmly within the rubric of "business, profession, occupation and calling of every kind," by which Rule 43–I(a) defines a business.

*Id.* at 158 (emphasis added; footnote omitted). In *Sullivan,* the complainant was taken to a hospital to treat injuries sustained in a fight with the defendant. Although the *Sullivan* court did not indicate the complainant's precise diagnosis, it is readily apparent that the complainant had received the type of physical injuries one might expect from a fistfight. Thus, the resulting diagnosis of physical injuries determined to be admissible under the business records exception in *Sullivan* was entirely consistent with the type of objective, nonconjectural diagnosis contemplated in *New York Life.* As the court in *New York Life* stated:

> The test [for admissibility of hospital records] should be whether [they] are ... of a *readily observable condition* of the patient or his treatment. There is no magic in the word diagnosis which makes everything which can be included in that term admissible. Some diagnoses are a matter of observation, others are a matter of judgment, still others a matter of pure conjecture. The admissibility of records of such diagnoses must depend upon their character.

*New York Life Ins. Co. v. Taylor, supra,* 79 U.S.App.D.C. at 75, 147 F.2d at 306 (emphasis added).

Nor are we persuaded by the government's argument, which the trial judge adopted, that for the purpose of admissibility under the business records exception, a diagnosis of PCP intoxication is equivalent to a diagnosis of alcohol intoxication. In discussing the types of readily observable conditions which are admissible under the exception, the *New York Life* court stated that "an observation that the patient was well under the influence of alcohol [is admissible]." *Id.* at 72–73, 147 F.2d at 303–04 (footnote omitted). Whether a patient is "well under the influence of alcohol" is not a matter about which competent physicians are likely to differ. Indeed, because alcohol intoxication is considered to be a matter of common knowledge, lay witnesses may render opinion testimony regarding alcohol intoxication. *Woolard v. District of Co-*

*lumbia,* 62 A.2d 640, 640–41 (D.C.Mun. App.1948); *State v. Welch,* 120 N.H. 687, 687, 421 A.2d 142, 142 (1980); *State v. Damoorgian,* 53 N.J.Super. 108, 113, 146 A.2d 550, 553 (1958). Thus, a diagnosis of alcohol intoxication is admissible under the business records exception because it is reliable and a jury's understanding of the basis and significance of such a diagnosis would not be significantly aided by cross-examination of the physician who rendered the opinion.[5]

■ By contrast, the record in the instant case suggests that whether a patient should be diagnosed as suffering from PCP intoxication is not inevitably a matter about which competent physicians would agree in the absence of any quantitative analysis, particularly if the patient is diagnosed as contemporaneously suffering from a mental illness with the same symptomatology.[6] Nothing in the medical records provides assurance that the use of *any* quantity of PCP is equivalent to PCP intoxication. Nor can it be presumed that the relationship between a diagnosis of PCP intoxication and impairment of the user's ability to perceive and recall events several days after the drug is ingested is "within the realm of common knowledge and everyday experience." *Adams v. United States,* 502 A.2d 1011, 1021 (D.C.1986) (citations omitted).

■ Accordingly, we hold that a diagnosis of PCP intoxication in conjunction with a diagnosis of histrionic personality disorder is a medical opinion which is not admissible under the business records exception,

and that the trial judge erred in admitting the diagnosis without "the safeguard of cross-examination of the physician who makes it," *New York Life, supra,* 79 U.S. App.D.C. at 73, 147 F.2d at 304, or another medical expert. *Ibn–Tamas v. United States,* 407 A.2d 626, 637 (D.C.1979), *appeal after remand,* 455 A.2d 893 (1983); *see Jones v. Prudential Ins. Co.,* 388 A.2d 476, 483 (D.C.1978) (usage of drugs documentable from lab reports distinguished from diagnosis of psychiatric illness); *Group Hospitalization, Inc. v. Westley,* 350 A.2d 745, 747 (D.C.1976) (opinion in the nature of a diagnosis excluded).

■ 2. *Nursing Entry and Lab Reports.* Durant also contends that a nursing entry describing his behavior on the morning of his admission and two lab reports stating that PCP had been detected in his urine are inadmissible under the business records exception to the hearsay rule. We disagree. The nursing entry is the type of medical record which is admissible under *New York Life* because it is "a product of routine procedure ... whose accuracy is substantially guaranteed by the fact that the record is an automatic reflection of observations." *Id.,* 79 U.S.App.D.C. at 72, 147 F.2d at 303; *see Christensen v. Gammons,* 197 A.2d 450, 452 (D.C.1964) (physical facts plain to the trained eye); *Washington Coca–Cola Bottling Works v. Tawney,* 98 U.S.App.D.C. 151, 152, 233 F.2d 353, 354 (1956) (glass fragments). Similarly, the lab reports were admissible as reflecting the results of standard testing procedures in the absence of any objection[7] as

5. This is distinct from whether expert testimony would be required regarding the effect of alcohol intoxication on the ability to perceive and recall. *See, e.g., Doepel v. United States,* 434 A.2d 449, 453–54 (D.C.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981). See also discussion of "credibility" in Part II B, *infra.*

6. The government contends that the medical records reflect no disagreement among the doctors treating Durant as to the propriety of the diagnosis of PCP intoxication. But even in the absence of disagreement, the relevant inquiry under *New York Life* is whether the particular medical condition is, by its very character, one about which competent physicians could reach

different medical conclusions, the circuit court contrasting statements of identification and statements of medical opinion. 79 U.S.App.D.C. at 73 n. 8, 147 F.2d at 304 n. 8.

7. Defense counsel did not oppose the admission of the "final lab report which indicates [a] positive [finding of PCP] in the urine." Since there were two different lab reports, it is unclear whether defense counsel acceded to the admission of both reports or only the "final lab report"; it is clear, however, that defense counsel did not object to the admission of either lab report. Thus, the propriety of their admission must be reviewed under the plain error standard. *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

to the reliability of the procedures employed. *See Jones v. Prudential Ins. Co., supra,* 388 A.2d at 483 (heroin use may be documented medically through lab tests); *Smith v. United States,* 337 A.2d 219, 223 (D.C.1975) (lab tests documenting presence of sperm admissible); *see also Brown v. United States,* 384 A.2d 647, 650 (D.C. 1978) (test must be "sufficiently reliable and accepted within the scientific community").

B.

■■ The question remains whether the medical evidence, which is admissible under the business records exception to the hearsay rule, provided a sufficient evidentiary foundation to permit its admission as extrinsic evidence for impeachment purposes.

Durant contends that the trial judge abused his discretion in allowing the prosecutor to impeach Durant with extrinsic evidence of his use of PCP and his bizarre behavior the day after the offense. He acknowledges that the "use of narcotics is a proper subject of inquiry going to the credibility of the witness in his recollection of the events in question." *Jackson v. United States,* 377 A.2d 1151, 1154 (D.C. 1977); *accord Wilson v. United States,* 232 U.S. 563, 569, 34 S.Ct. 347, 349, 58 L.Ed. 728 (1914); *United States v. Sampol,* 204 U.S.App.D.C. 349, 395, 636 F.2d 621, 667 (1980); *United States v. Kearney,* 136 U.S. App.D.C. 328, 331, 420 F.2d 170, 173 (1969). But he maintains that since he denied being under the influence of PCP on the day of the offense and the only contradictory evidence was a urine test showing an unspecified quantity of PCP one day later, and since there was an unrebutted defense proffer that PCP remains in the urine long after it has any influence on perception and memory, expert testimony was required to establish a proper foundation for using the test results as extrinsic evidence to impeach him.

■■ The general rule is that a party may not present extrinsic evidence to impeach a witness on collateral issues. *Washington v. United States,* 499 A.2d 95, 101 (D.C.1985); *Sherer v. United States,* 470 A.2d 732, 738 & n. 5 (D.C.1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984); *McClain v. United States,* 460 A.2d 562, 569 (D.C.1983). However, a witness' use of drugs is not considered a collateral issue when "an evidentiary foundation can be established that the witness was using drugs at the time of the incident." *Rogers v. United States,* 419 A.2d 977, 981 (D.C.1980); *see* E. Cleary, McCormick on Evidence § 45, at 105 (3d ed. 1984). Thus, a party offering extrinsic evidence to impeach a witness' denial of being under the influence of drugs at the time of the incident must first establish a sufficient evidentiary foundation that the witness in fact was under the influence of drugs at the relevant time. Cases in this jurisdiction permitting impeachment on the basis of drug use have yet to address the sufficiency of the evidentiary foundation needed to impeach with extrinsic evidence in the context of a defense proffer that trace amounts of PCP can be detected in a person's urine long after the effect of the drug has dissipated. We hold that the government's proffer of lab reports indicating an unspecified quantity of PCP in Durant's urine and no PCP in his bloodstream was inadequate, in view of Durant's unrebutted proffer and his denial of use on the date of the offense, to establish that Durant was under the influence of PCP at the time of the offense. *See United States v. Leonard,* 161 U.S.App.D.C. 36, 52, 494 F.2d 955, 971 (1974). Hence, the evidence of his PCP use at some undetermined time prior to the events in question was not probative of impaired perception and memory and did not provide a sufficient evidentiary foundation for use as extrinsic impeachment evidence.[8]

---

**8.** Durant contends further that, even if the government had called an expert witness, a purely qualitative urine test would not provide a sufficient evidentiary basis for an expert opinion on Durant's perceptual state. *Cf. United States v. Roy,* 114 Daily Wash.L.Rptr. 2481,

2488–89 (D.C.Super.Ct. Dec. 1, 1986) (in the absence of expert testimony to a reasonable degree of medical certainty on time within which PCP remains in body at levels detectable in urine, government failed to meet its burden of proof beyond a reasonable doubt that defendant vio-

The evidence of Durant's drug use and bizarre behavior the day after the offense was introduced for the limited purpose of impeaching Durant's credibility as a witness. Credibility is not a simple concept, however. Where drug use is the basis for attacking a witness' credibility, a distinction must be drawn between the witness' veracity and the witness' ability to recall events. The term "credibility" is often used broadly to cover both aspects. *See, e.g., Jackson, supra*, 377 A.2d at 1154. But, as Judge Leventhal pointed out in *Kearney, supra*, impeachment of a witness' veracity is not the same as impeachment based on the witness' impaired "competency and capacity to observe, remember and recall." 136 U.S.App.D.C. at 331–32, 420 F.2d at 175–76. Thus, when Durant denied that he was under the influence of PCP at any time on February 14, the presence of PCP in his urine one day later might have provided, consistent with the unrebutted defense proffer, a basis for expert testimony from which a jury reasonably could have found Durant's denial was not truthful. This type of impeachment of credibility is clearly distinct from that which would support a finding by a jury that PCP adversely affected Durant's ability to perceive and recall what had happened on February 14 and therefore his testimony about the events of that day was not worthy of belief.

In our prior decisions holding that drug use is relevant to credibility, the factual circumstances have not required that the court address the distinction between veracity and ability to perceive and recall events. In *Jackson, supra*, 377 A.2d 1151, we affirmed the trial court's finding of no substantial prejudice where the prosecutor improperly attempted to impeach the defendant's denial that he used heroin at the time of the crimes with a court order requiring him to get heroin treatment, but the defendant admitted use of cocaine and marijuana. In *Durant v. United States*, 292 A.2d 157, 160–61 (D.C.1972), *cert. denied*, 409 U.S. 1127, 93 S.Ct. 946, 35 L.Ed. 2d 259 (1973), the only authority cited in *Jackson*, the issue was whether a prior conviction for possession of narcotics was an impeachable offense under D.C.Code § 14–305(b)(1) (1972 Supp. V.). In the leading case of *Wilson v. United States, supra*, 232 U.S. 563, 34 S.Ct. 347, the witness admitted using morphine before taking the witness stand and the Court held such evidence could properly be used to assess her reliability as a witness. *Id.* at 568, 34 S.Ct. at 349. In *Jackson* and *Wilson* the necessary evidentiary foundation was established by the witnesses' admissions of drug use. *Cf. Sampol, supra*, 204 U.S.App.D.C. at 395, 636 F.2d at 667 ("before the court will permit a witness to be questioned before the jury about his use of narcotics, counsel must establish a foundation showing either that the witness was using drugs at the time he observed the events in dispute . . . or that he was under the influence of narcotics while testifying") (citations omitted). Unlike these cases, Durant denied being under the influence of PCP on February 14, 1984, and the issue is whether its presence in trace quantities[9] in his urine a day later provided a sufficient evidentiary foundation to conclude that his ability to perceive and recall events was adversely affected.

The trial judge permitted the prosecutor to impeach Durant's testimony on the basis that the presence of an unspecified amount of PCP in his urine on February 15 and his bizarre behavior at the hospital provided a sufficient evidentiary foundation on which the jury could find not only that Durant was under the influence of PCP on February 14, but that his behavior and his ability to perceive and recall events on February 14 were adversely affected as a result, and he was therefore not a credible witness. We disagree, and hold that the trial judge

lated court order to refrain from drug use). We need not address this argument for purposes of this appeal.

**9.** Although the urine test was a qualitative, not quantitative test, it can be inferred that Durant's urine contained only trace amounts of PCP since the blood test failed to detect the presence of any PCP at all. The government offered no medical evidence to support a contrary inference.

abused his discretion[10] in permitting that evidence to be used either for the purpose of establishing that Durant was under the influence of PCP on February 14 or for the purpose of calling into question his ability to perceive and recall the event of that date. Given the questions raised by defense counsel concerning the significance of trace amounts of PCP in the urine the day after the events being considered, we are persuaded that the evidence adduced by the government provided too slim a reed to support a conclusion that Durant was under the influence of PCP at the time of those events, or had consumed PCP at such time as it would have been reasonable for the jury to infer that the PCP was affecting Durant's behavior or ability to perceive and recall events. While we are not holding that expert testimony is necessary to establish the link between drug usage and ability to perceive and recall events, *cf. Kearney, supra,* 136 U.S.App.D.C. at 331–32, 420 F.2d at 173–74, we observe that under the circumstances present here, expert testimony might have imparted probative value to the medical evidence in order to establish a proper foundation for its use as extrinsic impeachment evidence.[11] *See*

---

**10.** *See Hinnant v. United States,* 520 A.2d 292, 293 (D.C.1987) (trial judge has broad discretion to admit or exclude expert testimony); *Gant v. United States,* 518 A.2d 103, 110 & n. 16 (D.C. 1986) (criteria for admitting expert testimony on ultimate issue); *Sherrod v. United States,* 478 A.2d 644, 652 (D.C.1984) (trial judge has broad discretion to control the scope of cross-examination); *Quarles v. United States,* 308 A.2d 773, 775 (D.C.1973) (jury may draw reasonable inferences from the evidence).

**11.** Although Durant's dual diagnosis of PCP intoxication and histrionic personality disorder based upon the same symptomatology might have provided an alternative basis for the need for expert testimony, the parties agreed to keep the issue of mental illness from the jury, so we do not reach this issue.

**12.** Judge Weinstein reports that a minority of jurisdictions admit evidence of drug use without requiring proof that the witness' testimonial capacities were impaired, usually on the theory that the user is a liar, which, Weinstein suggests, appears to address character rather than impairment. J. Weinstein & M. Berger, 3 Weinstein's Evidence ¶ 607[04], at 607–59 (1987). In his view, the sounder position, taken by many state courts, is that such evidence is not admitted "unless it can also be proved that the use of

*Leonard, supra,* 161 U.S.App.D.C. at 53, 494 F.2d at 972 ("we recognize the desirability of increasing judicial appreciation of the general effects of drug use on perception, memory, and credibility and the knowledge that expert testimony may bring to this troublesome issue"); *Curry v. United States,* 520 A.2d 255, 268 (D.C. 1987) (evidence is relevant if it has some logical tendency to prove or disprove a disputed material issue); *Reavis v. United States,* 395 A.2d 75, 78 (D.C.1978) (discussing relevancy and defining probative evidence (quoting *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977)); *see also* Fed.R.Evid. 401.[12]

### C.

■ The question remains whether Durant's impeachment with his drug use was harmless error. *Kotteakos v. United States,* 328 U.S. 750, 756, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). We conclude that it was not.

The trial judge admitted the diagnosis of PCP intoxication to show Durant's condition on the date of the charged offense because he had testified unexpectedly that

---

narcotics has impaired the sensory, retentive or communicative facilities of the witness." *Id.* (citation omitted). *See, e.g., State v. Rifkin,* 140 Vt. 472, 438 A.2d 1122 (1981) and *Smithhart v. State,* 503 S.W.2d 283 (Tex.Crim.App.1973), holding that criminal convictions for driving under the influence of drugs cannot stand absent expert testimony linking the defendant's symptoms of incapacitation to the use of drugs. He explains his criticism of jurisdictions that admit evidence of drug usage on the theory that the jury is capable of determining whether the usage adversely affected the witness' testimonial capacity as follows:

> Whether [the conclusion that juries understand the effects of drug use on testimonial capacity] is warranted in the absence of expert evidence is questionable since studies suggest that the effect of narcotics on credibility cannot be assessed without knowledge of the type of drug involved, the type of reaction it causes, the amount of the drug the witness was using at the time he observed the event in issue, and the mental characteristics of the individual who is testifying, a task which seems to require information beyond that ordinarily attributable to the average juror.

Weinstein's Evidence, *supra,* ¶ 607[04], at 607–61.

he had been beaten by the police. However, once the prosecutor asked Durant whether he remembered passing out in the squad car on the way to the police station, it was inevitable that Durant would mention the alleged attack by the police. *See Jones v. United States*, 385 A.2d 750, 753 n. 2 (D.C.1978). The medical records introduced in the government's rebuttal case went beyond controverting Durant's denials that he was under the influence of PCP on February 14 and that he had told a doctor on February 20 that he could not remember what had happened on February 14. To the extent the prosecutor was permitted to link Durant's diagnosis of PCP intoxication to his behavior and his ability to perceive and recall events, Durant's entire testimony about the events of February 14 was impeached.

Furthermore, the prosecutor asked the jury in his rebuttal closing argument "Is it believable that a witness whose *brains are blown out* on PCP is going to remember what's going on?" Defense counsel objected and the trial judge instructed the jury to disregard the words "brains blown out." The prosecutor then proceeded to connect Durant's drug use with his bizarre behavior at the hospital and his behavior on February 14 by arguing to the jury that Durant's version of the facts was not credible, thus effectively undermining the cautionary instruction. In addition, when defense counsel argued in his closing argument that if the jury found Durant was suffering from PCP intoxication on February 14 and his abilities to perceive and recall were impaired, then he did not have the specific intent required for a conviction of assault with intent to rob, the trial judge sustained the prosecutor's objection and erroneously instructed the jury that it could not consider Durant's PCP intoxication as bearing on his specific intent to commit the assault. *Carter v. United States*, 531 A.2d 956, 960, 964 n. 20 (D.C.1987) (voluntary intoxication is a defense to specific intent crimes) (citing *Parker v. United States*, 123 U.S.App.D.C. 343, 345–47 & n. 5, 359 F.2d 1009, 1011–13 & n. 5 (1966)); *Harris v. United States*, 375 A.2d 505, 508 (D.C. 1977) (voluntary intoxication is not an excuse but may negate defendant's specific intent).

This case involved a classic credibility contest between Richards and Durant. Richards' testimony was impeached in several respects and Officer Williams' testimony contradicted Richards' assertions about Durant's "poppy" eyes and "jittery" posture. The prosecutor was permitted to impeach Durant's testimony through the use of "highly inflammatory" drug evidence, *Rogers, supra*, 419 A.2d at 981, to cast doubt on Durant's version of what had happened in Richards' cab. The judge's instructions to the jury that it could only use the drug evidence in evaluating his ability to recall events and his credibility as a witness and could not use the evidence to determine his guilt of assault with intent to rob exacerbated the prejudice. *See Jones v. United States, supra*, 385 A.2d at 753; *Kearney, supra*, 136 U.S.App.D.C. at 332, 420 F.2d at 174.

Accordingly, because Durant was substantially prejudiced by the admission of the medical evidence of PCP use and intoxication, the error was not harmless and the judgment must be reversed.[13]

NEWMAN, Associate Judge, concurring:

Much has happened since 1945, when *New York Life Insurance Co. v. Taylor*, 147 F.2d 297 (D.C.Cir.1945), was decided. That case applied the so-called "federal

---

13. We find no merit to Durant's contention that the trial judge abused his discretion in allowing the prosecutor to impeach Durant with a prior inconsistent statement. The prosecutor's question was clarified upon defense objection, Durant initially responded that he did not recall events during the time he was unconscious, and then denied telling a doctor on February 20 that he could not recall the events leading to his arrest. *Martin v. United States*, 452 A.2d 360, 363 (D.C.1982); *Crews v. United States*, 514 A.2d 432, 437 (D.C.1986). Even if, as Durant contends, the prosecutor did not have a basis for asking the question, at least not insofar as he was relying on the medical records, any error was harmless in view of Durant's responses, particularly after defense counsel's objection for imprecision was sustained. *Kotteakos, supra*, 328 U.S. at 756, 66 S.Ct. at 1243.

shopbook rule", 28 U.S.C. § 1732(a). Section 1732 was repealed on July 1, 1975, and was replaced by FEDERAL RULES OF EVIDENCE 803(6). However, on June 30, 1975, local rule 43–I became effective in the Superior Court. Super.Ct.Civ.R. 43–I. That rule is substantially identical to the former federal shopbook rule.

Rule 803(6) of the FEDERAL RULES OF EVIDENCE is substantially broader in the admissibility of diagnoses and opinions that was the federal shopbook rule. "Rule 803(6) in accord with the trend of state decisions and the conclusion of leading authorities rejects any attempt to exclude a particular class of hospital records. Diagnoses and opinions, without regard to routine vis-a-vis conjectural, or physical as against psychiatric, are included as proper subjects of admissible entries in addition to acts, events and conditions." WEINSTEIN'S EVIDENCE, ¶ 803(6) [06], at 803–200 (1988) (footnotes omitted).[1] According to the Advisory Committee Note to 803(6), Rule 803(6) was intended to overturn such decisions as *New York Life, supra*, and *Lyles v. United States*, 254 F.2d 725 (D.C.Cir. 1957), *cert. denied*, 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958). *See* Rules of Evidence for United States Courts and Magistrates, 56 F.R.D. 183, 309 (1973).

An analysis of what was at issue under the federal shopbook rule in *New York Life Insurance Co. v. Taylor, supra*, is instructive in understanding that decision. The insured decedent died while a patient at Walter Reed General Hospital by falling down a stairwell. There were no witnesses. The circumstances of the fall indicated the possibility of suicide. Taylor sued New York Life seeking to recover the double indemnity payable upon accidental death. New York Life sought to introduce records of the hospital relating to the cause of death of the insured, seeking to show that the decedent committed suicide. These records consisted of the (1) patient's history given upon admission, including an account of his illness and his mental state;

(2) diagnosis upon admission; (3) reports of three operations performed in the hospital; (4) recordation of insured's statements indicating he was contemplating suicide; (5) report of psychiatrist's consultation resulting from contemplated suicide; (6) psychiatric diagnosis; and (7) the transcript of Walter Reed Hospital's Board of Officers' proceedings, including findings with respect to cause of death. The trial court sustained Taylor's objection to the admission of these records; New York Life appealed an adverse jury verdict.

The United States Court of Appeals for the District of Columbia Circuit affirmed. *New York Life, supra*, 147 F.2d at 299. It held that the Supreme Court, in *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), "limited the admission of records under the federal shopbook rule statute to those which are trustworthy because they represent routine reflections of day-to-day operations." *New York Life, supra*, 147 F.2d at 300. Since these records were "not offered to prove routine facts such as the date of admission to the hospital, the names of attending physicians, etc.," they were not admissible. *Id.* In his dissent, Judge Edgerton argued that all of the proffered medical records (except for the transcript of the Board of Officers' proceedings) should have been admitted under the federal shopbook statute. To support his view, he pointed to the medical records cases cited with approval in the congressional committee reports as the type of records to be admitted under the federal shopbook statute Congress was then considering (and later adopted). He noted that both the Second and Third Circuits had adopted this position. He pointed out that the federal statute was virtually identical to the Model Act and that courts in states which had adopted the Model Act had applied it repeatedly to medical records, including diagnosis (including in at least New York, a diagnosis of manic depressive insanity). He noted further that

---

1. FED.R.EVID. 803(6) explicitly gives the trial court discretion to exclude records where "the source of information or the method or circumstances of preparation indicate lack of trustwor-

thiness." *See also* FED.R.EVID. 403 (trial court may exclude otherwise relevant evidence if its probative value is "substantially outweighed by the danger of unfair prejudice ...").

even before the adoption of the federal shopbook act, the District of Columbia Circuit had held that diagnoses and opinions as well as observations of medical officers contained in medical records were admissible (citing *United States v. Balance*, 59 F.2d 1040, 1042 (D.C.Cir.1932)). That hospitals rely on these diagnoses and opinions of medical officers in matters of life and death provided the necessary indicia of trustworthiness in Judge Edgerton's view to render them admissible. He found *Palmer v. Hoffman, supra*, easily distinguishable given the issue presented in that case—the admissibility when offered by the railroad defendant of the statement that the engineer of the train made to his supervisor about the cause of the accident in which Hoffman and his wife suffered injury. Judge Edgerton noted correctly that the Supreme Court found the records were not admissible since the business of railroads is railroading, not investigating accidents in which its trains were involved. In essence, Judge Edgerton argued that the records in *Palmer v. Hoffman* were rejected because they lacked the necessary indicia of trustworthiness, noting that "the primary utility [of such reports] is in litigating, not railroading." *New York Life, supra*, 147 F.2d at 301 (Edgerton, J., dissenting) (citing *Palmer, supra*, 318 U.S. at 114, 63 S.Ct. at 480).

Subsequent to *New York Life*, the Second,[2] Third,[3] Fourth,[4] Seventh,[5] Eighth,[6] and Ninth[7] Circuits held medical records, including diagnoses and opinions admissible under the federal shopbook statute.

We have cited *New York Life v. Taylor, supra*, in construing Super.Ct.Civ.R. 43–I; *see, e.g., Rotan v. Egan*, 537 A.2d 563, 566

(D.C.1988); *Adkins v. Morton*, 494 A.2d 652, 662 (D.C.1985); *Christensen v. Gammons*, 197 A.2d 450, 452–53 (D.C.1964), although we were not required to follow *New York Life*, since it addressed the applicability of the federal rule, not our local rule. *M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971); *see West v. United States*, 346 A.2d 504, 506 (D.C.1975) (rejecting proposition that D.C. Court of Appeals "is bound by the interpretation given to similar procedural rules by the District of Columbia Circuit Court"). *See also Joyner v. United States*, 540 A.2d 457, 459 n. 1 (D.C.1988) (stating that "federal appellate court construction of comparable federal rules is persuasive authority in interpreting local rules"); *Tupling v. Britton*, 411 A.2d 349, 351 (D.C. 1980) (same); *Bazata v. National Insurance Co.*, 400 A.2d 313, 314 n. 1 (D.C.1979) (stating that D.C. Court of Appeals is not bound in its interpretation of Superior Court Rules by federal courts interpretations of analogous federal rules, although such interpretation may be persuasive).

Our reliance on *New York Life* has caused us to state the admissibility test to be whether the diagnosis or opinion is one "upon which competent physicians would not disagree." *Rotan v. Egan, supra*, 537 A.2d at 566 (citing *Washington Coca–Cola Bottling Works v. Tawney*, 98 U.S.App.D. C. 151, 152, 233 F.2d 353, 354 (1956). Such a test not only deprives the rule of its utility where medical issues are in real dispute, but also places on the trial court, and ultimately on us, trained in law, not medicine, the task of determining whether a diagnosis or opinion is one about which physicians would be in agreement. *See, e.g., Jones v. Prudential Insurance Com-*

2. *See, e.g., White v. Zutell*, 263 F.2d 613 (2d Cir.1959); *Terrasi v. South Atlantic Lines*, 226 F.2d 823 (2d Cir.1955), *cert. denied*, 350 U.S. 988, 76 S.Ct. 475, 100 L.Ed. 855 (1956).

3. *See, e.g., Bartkoski v. Pittsburgh & Lake Erie R.R. Co.*, 172 F.2d 1007 (3d Cir.1949). *See also Norwood v. Great American Indem. Co.*, 146 F.2d 797 (3d Cir.1944), a case decided prior to *New York Life*.

4. *See, e.g., Thomas v. Hogan*, 308 F.2d 355 (4th Cir.1962) (en banc); *Kay v. United States*, 255 F.2d 476 (4th Cir.), *cert. denied*, 358 U.S. 825, 79 S.Ct. 42, 3 L.Ed.2d 65 (1958).

5. *See, e.g., United States v. Ware*, 247 F.2d 698 (7th Cir.1957).

6. *See, e.g., Glawe v. Rulon*, 284 F.2d 495 (8th Cir.1960); *Missouri–Kansas–Texas R.R. Co. v. Ridgway*, 191 F.2d 363 (8th Cir.1951).

7. *See, e.g., Lew Moon Cheung v. Rogers*, 272 F.2d 354 (9th Cir.1959); *Medina v. Erickson*, 226 F.2d 475 (9th Cir.1955), *cert. denied*, 351 U.S. 912, 76 S.Ct. 702, 100 L.Ed. 1446 (1956).

*pany of America,* 388 A.2d 476 (D.C.1978) heroin usage); *Smith v. United States,* 337 A.2d 219 (D.C.1975) (vaginal pap smears); *Christensen v. Gammons, supra* (cerebral thrombosis and hypertension). We are ill-suited to such a task.

The approach taken by FED.R.EVID. 803(6) is far preferable. This rule focuses on trustworthiness which is what the law of evidence should focus on. In my view, it has greater predictability, while retaining the trial court's right, subject to appellate review, to exclude that which is untrustworthy.

Whatever may be the validity of *New York Life* where psychiatric opinion is offered by an insurance company to prove that its insured died by suicide rather than by accident (i.e. on the issue of factual causation), its application more generally is, in my view, suspect. Indeed, I find Judge Edgerton's dissent to be insightful and persuasive. It's long past time for us to reexamine this area of the law. We should adopt the approach of FED.R.EVID. 806(6) as have a multitude of states. *See* for a compilation of state adaptions, WEINSTEIN'S EVIDENCE, *supra,* ¶ 803(6) [8] at 803-213-25.

This is not a proper case in which to embark on this task, for I share the view expressed in Chief Judge Rogers' opinion that, on the facts of this case, given the evidence of mental illness, the diagnosis of PCP intoxication lacked sufficient indicia of trustworthiness to be admissible, and that other portions of the records lack relevance without expert testimony.